POLICE REPORT

San Antonio

EXHIBIT 1

| Offense Case # | Incident Type | CFS Number |
|---|---|---|
| SAPD17193689 | POLICE REPORT | SAPD-2017-0951526 |
| Primary Offense: EMERGENCY DETENTION | | Page 1 of 2 |
| Date / Time Occurred: 9/1/2017 16:00 to 9/1/2017 18:12 | | Date / Time Reported: 9/1/2017 18:13 |

| Situation Found | Type Of Search | Location Given By Dispatcher | Related Case # |
|---|---|---|---|
| Mental Health Disturbance * | Incident To Arrest | 5802 PECAN VALLEY DR | |

| Hate Crime | Arson | Damage Value | Clearance |
|---|---|---|---|
| | | | |

Elements of the Incident

☐ Confidential ☐ Domestic Violence ☐ Drive by Shooting ☐ Gang Related ☐ High Profile ☐ Juvenile Related ☐ Video Surveillance Available ☐ Video Surveillance Received

| Street Address | | | | | Unit Type |
|---|---|---|---|---|---|
| 5802 PECAN VALLEY DR | | | | | |
| Unit No | City | State | Zip | County | Building No |
| | SAN ANTONIO | Texas | 78223 | Bexar County | |
| Floor No | District | | | | |
| | 4260 | | | | |

| | Name | Unit Type | Badge # |
|---|---|---|---|
| ☐ Notified Detective | Detective Name: | Detective Unit Type: | Detective Badge #: |
| ☐ Notified Supervisor | Supervisor Name: | Supervisor Unit Type: | Supervisor Badge #: |
| ☐ Notified Medical Examiner | Medical Examiner Name: | Medical Examiner Unit Type: | Medical Examiner Badge #: |
| ☐ Notified Crisis Response Team | Crisis Response Name: | | |
| ☐ Priority Notification | Priority Name: | | |
| ☑ Notified Victim | Explanation: | | |
| ☐ CSI Requested | CSI Name: | CSI Unit Type: | CSI Badge #: |

| ☐ BOLO | Reporting Officer | Employee Number |
|---|---|---|
| | RAMIREZ, JUSTIN | [redacted] |
| Badge #: 1514 | Assignment: Patrol Division | |

| ☑ Primary Offense | Report Offense | |
|---|---|---|
| | EMERGENCY DETENTION | |
| UCR Category | Attempted Completed | |
| 000071 | Completed | |
| Premise | Circumstances | Weapon |
| Apartment/Condo | Unknown Circumstances | UNARMED |
| Weapon Brand | Weapon Model | Weapon Color |
| | | |
| Criminal Activity 1 | Criminal Activity 2 | Criminal Activity 3 |
| CA1 - MENTAL HEALTH RELATED | CA2 - EMERGENCY DETENTION | CA3 - UNIVERSITY HOSPITAL |

OTHER PERSON — Person Type: EMERGENCY DETENTION

| Last Name | First Name | Middle Name | Nickname | Suffix |
|---|---|---|---|---|
| DOTSON | JANICE | | | |

| Race | Sex | SSN | Date of Birth | Age | Age Range |
|---|---|---|---|---|---|
| BLACK | Female | | 04/02/1957 | 60 | to |

| Weight | Height | Driver's License # | DL State | Place of Birth |
|---|---|---|---|---|
| | | | | |

| Preferred | Home Phone | Cell Phone | Email Address |
|---|---|---|---|
| | | | |

Other Person Home Address

| Street Address | | | | | Unit Type |
|---|---|---|---|---|---|
| 5802 PECAN VALLEY DR | | | | | |
| Unit No | City | State | Zip | Building No | Floor No |
| | SAN ANTONIO | Texas | 78223 | | |

| ☐ Student | Employer | Occupation |
|---|---|---|
| | | UNKNOWN |

Other Person Employer Address

| Street Address | | | | | Unit Type |
|---|---|---|---|---|---|
| | | | | | |
| Unit No | City | State | Zip | Building No | Floor No |
| | SAN ANTONIO | Texas | | | |

Details

POLICE REPORT

San Antonio

EXHIBIT 1

| Offense Case # | Incident Type | CFS Number |
|---|---|---|
| SAPD17193889 | POLICE REPORT | SAPD-2017-0951526 |
| Primary Offense: EMERGENCY DETENTION | | Page 2 of 2 |
| Date / Time Occurred: 9/1/2017 16:00 to 9/1/2017 18:12 | | Date / Time Reported: 9/1/2017 18:13 |

| Work Phone | Hours of Employment | Hair Color | Hair Length | Glasses |
|---|---|---|---|---|
| | to | Black | Ear Top | ☐ |

| Eye Color | Build | Facial Hair | Voice | Complexion |
|---|---|---|---|---|
| Brown | Heavy | None | LOUD | Dark |

| Ethnicity | Demeanor |
|---|---|
| Non-Hispanic | Irrational |

Narrative Legend

ED1 = DOTSON, JANICE

Narrative Information

While on East Patrol Evening shift, I was dispatched to the location for a mental health disturbance. Upon arrival at the location, I observed ED1 to be sitting outside of her apartment. ED1 was waving and signaling myself over to her. I approached ED1 and ED1 stated she did not need police. ED1 stated all she needed was "Anthony". ED1 stated Anthony was an African black god and she loves him. I asked ED1 where Anthony was and ED1 stated he was around. I asked ED1 if she was taking any medication. ED1 stated she was prescribed medicine for her blood pressure and her cholesterol. ED1 stated she has not taken her medicine in two weeks. ED1 lives at an apartment complex for individuals who have mental illness. ED1 was threatening other tenants. ED1 was posing as a threat to the other tenants. ED1 began to talk to Anthony, who was not there. I began to ask ED1 if she would be willing to go to the hospital with me. ED1 refused. After communicating with ED1, ED1 agreed to come with me. I transported ED1 to University Hospital without incident. I stood by as ED1 was admitted to University hospital as an Emergency Detention. BWC / COBAN available.

POLICE REPORT

San Antonio

EXHIBIT 1

| Offense Case # | Incident Type | CFS Number |
|---|---|---|
| SAPD14056770 | OFFENSE | SAPD-2014-0253792 |
| Primary Offense: EMERGENCY DETENTION | | Page 1 of 3 |
| Date / Time Occurred: 3/18/2014 23:00 to 3/19/2014 01:31 | | Date / Time Reported: 3/19/2014 01:31 |

| Situation Found | Type Of Search | Location Given By Dispatcher | Related Case # |
|---|---|---|---|
| Mental Health Related | None | 131 E HIGHLAND BLVD | |
| Hate Crime | Arson | Damage Value | Clearance |

## Elements of the Incident

☐ Confidential ☐ Domestic Violence ☐ Drive by Shooting ☐ Gang Related ☐ High Profile ☐ Juvenile Related ☐ Video Surveillance Available ☐ Video Surveillance Received

| Street Address | | | | | Unit Type |
|---|---|---|---|---|---|
| 131 E HIGHLAND BLVD | | | | | Apartment |
| Unit No: 3 | City: SAN ANTONIO | State: Texas | Zip: 78210 | County: Bexar County | Building No: 1 |
| Floor No: 2 | District: 2150 | | | | |

| | | | |
|---|---|---|---|
| ☐ Notified Detective | Detective Name | Detective Unit Type | Detective Badge # |
| ☐ Notified Supervisor | Supervisor Name | Supervisor Unit Type | Supervisor Badge # |
| ☐ Notified Medical Examiner | Medical Examiner Name | Medical Examiner Unit Type | Medical Examiner Badge # |
| ☐ Notified Crisis Response Team | Crisis Response Name | | |
| ☐ Priority Notification | Priority Name | | |
| ☐ Notified Victim | Explanation | | |
| ☐ CSI Requested | CSI Name | CSI Unit Type | CSI Badge # |
| ☐ BOLO | Reporting Officer: PIANFETTI, DAVID | Employee Number: [redacted] | |
| Badge #: 1565 | Assignment: Patrol Division | | |

| | | |
|---|---|---|
| ☑ Primary Offense | Report Offense: EMERGENCY DETENTION | |
| UCR Category: 000071 | Attempted Completed: Completed | |
| Premise: Apartment/Condo | Circumstances: Other Circumstances | Weapon: FEET |
| Weapon Brand | Weapon Model | Weapon Color |
| Criminal Activity 1 | Criminal Activity 2 | Criminal Activity 3 |

OTHER PERSON — Person Type: EMERGENCY DETENTION

| Last Name | First Name | Middle Name | Nickname | Suffix |
|---|---|---|---|---|
| DOTSON | JANICE | KAREN | | |

| Race | Sex | SSN | Date of Birth | Age | Age Range |
|---|---|---|---|---|---|
| BLACK | Female | 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 | 04/02/1957 | 56 | to |

| Weight | Height | Driver's License # | DL State | Place of Birth |
|---|---|---|---|---|
| 170 | 5'07" | 09717747 | Texas | SAN ANTONIO, TX |

| Preferred | Home Phone | Cell Phone | Email Address |
|---|---|---|---|
| | 210-909-5105 | | |

**Other Person Home Address**

| Street Address | | | | | Unit Type |
|---|---|---|---|---|---|
| 131 E HIGHLAND BLVD | | | | | Apartment |
| Unit No: 3 | City: SAN ANTONIO | State: Texas | Zip: 78210 | Building No: 1 | Floor No: 2 |

☐ Student — Employer — Occupation

**Other Person Employer Address**

| Street Address | | | | | Unit Type |
|---|---|---|---|---|---|
| Unit No | City | State | Zip | Building No | Floor No |

**Details**

POLICE REPORT

San Antonio

EXHIBIT 1

| Offense Case # | Incident Type | CFS Number |
|---|---|---|
| SAPD14056770 | OFFENSE | SAPD-2014-0253792 |
| Primary Offense: EMERGENCY DETENTION | | Page 2 of 3 |
| Date / Time Occurred: 3/18/2014 23:00 to 3/19/2014 01:31 | | Date / Time Reported: 3/19/2014 01:31 |

| Work Phone | Hours of Employment | Hair Color | Hair Length | Glasses |
|---|---|---|---|---|
| | to | Brown | Other | ☐ |

| Eye Color | Build | Facial Hair | Voice | Complexion |
|---|---|---|---|---|
| Brown | Heavy | | POOR SPEAKING ABILITY | Dark |

| Ethnicity | Demeanor |
|---|---|
| Unknown | Irrational |

**OTHER PERSON** — Person Type: REPORTING PERSON

| Last Name | First Name | Middle Name | Nickname | Suffix |
|---|---|---|---|---|
| [redacted] | [redacted] | | | |

| Race | Sex | SSN | Date of Birth | Age | Age Range |
|---|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | to |

| Weight | Height | Driver's License # | DL State | Place of Birth |
|---|---|---|---|---|
| [redacted] | [redacted] | | | |

| Preferred | Home Phone | Cell Phone | Email Address |
|---|---|---|---|
| | | [redacted] | |

**Other Person Home Address**

| Street Address | Unit Type |
|---|---|
| [redacted] | [redacted] |

| Unit No | City | State | Zip | Building No | Floor No |
|---|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

☐ Student | Employer | Occupation

**Other Person Employer Address**

| Street Address | Unit Type |
|---|---|
| | |

| Unit No | City | State | Zip | Building No | Floor No |
|---|---|---|---|---|---|
| | [redacted] | [redacted] | | | |

**Details**

| Work Phone | Hours of Employment | Hair Color | Hair Length | Glasses |
|---|---|---|---|---|
| | to | [redacted] | [redacted] | ☐ |

| Eye Color | Build | Facial Hair | Voice | Complexion |
|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

| Ethnicity | Demeanor |
|---|---|
| [redacted] | [redacted] |

Narrative Legend

ED1 = DOTSON, JANICE KAREN
RP1 = [redacted]

Narrative Information

OFC LIENDRO, S. #0418
OFC SANFORD, J. #1226
OFC RICHMOND, R. #0564

I WAS DISPATCHED TO THE LOCATION FOR A REPORT OF A "MENTALLY ILL FEM CAUSING DIST.....UNK INTOX....UNK WPNS ***FEM IS OFF HER MEDS***". UPON ARRIVAL, (R1) SAID (ED1) WAS OUT OF CONTROL. (ED1) WAS NAKED AND LYING DOWN ON THE FLOOR. (ED1) WAS VERBAL, BUT WAS MAKING GRUNTING NOISES AND WHILE BREATHING IN DEEPLY AND EXHALING WITH SPATTER OF SALIVA OUT OF HER MOUTH. (ED1) HAD A CONFUSED, CRAZED, ANGRY, AND INTENSE EXPRESSION ON HER FACE. I ASKED (ED1) TO GET OFF THE FLOOR AND TO GET DRESSED. (ED1) GOT OFF THE FLOOR, WALKED INTO THE LIVING ROOM AREA AND THREW HERSELF BACKWARD ONTO A COUCH REPEATEDLY. (R1) SAID (ED1) HAD BEEN BEHAVING IN THAT MANNER FOR OVER THREE HOURS. (R1) SAID (ED1) WAS "BI-POLAR" AND OFF HER MEDICATION. (R1) SAID (ED1) REFUSED TO TAKE HER MEDICATIONS FOR OVER THREE (3) MONTHS. (R1) HAD NO LEGITIMATE REASON FOR NOT TAKING (ED1) TO A HOSPITAL PRIOR TO HER CONDITION DETERIORATING TO THE CONDITION (ED1) WAS IN. I ATTEMPTED TO PLACE A DRESS OR GOWN ONTO (ED1). (ED1) SWUNG HER ARMS AND FISTS AT ME IN AN ATTEMPT TO HIT ME. I MOVED OUT OF THE WAY OF (ED1) AND (ED1) THREW HERSELF TOWARD THE FLOOR OF THE APARTMENT. OFC LIENDRO GRABBED (ED1)'S RIGHT ARM AS (ED1) ATTEMPTED TO KICK AT ME. I GRABBED (ED1)'S LEFT ARM AND HANDCUFFED (ED1) BEHIND HER BACK. (ED1) REMAINED ON THE FLOOR ATTEMPTING TO BANG HER HEAD ON THE FLOOR IF SHE WAS ALLOWED TO AND KICKING AT ANYONE WHO WALKED NEAR HER FEET.

POLICE REPORT

San Antonio

EXHIBIT 1

| Offense Case # | Incident Type | CFS Number |
| --- | --- | --- |
| SAPD14058770 | OFFENSE | SAPD-2014-0253792 |
| Primary Offense: EMERGENCY DETENTION | | Page 3 of 3 |
| Date / Time Occurred: 3/18/2014 23:00 to 3/19/2014 01:31 | | Date / Time Reported: 3/19/2014 01:31 |

I REQUESTED ADDITIONAL OFFICERS TO THE LOCATION TO ASSIST WITH TRANSPORT OF (ED1) TO A HOSPITAL ALONG WITH A EMS UNIT TO USE A BACK-BOARD TO GET (ED1) OUT OF THE UPSTAIRS APARTMENT AND TO A HOSPITAL. OFC SANFORD ATTEMPTED TO PLACE LEG-IRONS ON (ED1)'S ANKLES TO SECURE HER FEET. (ED1) KICKED OFC SANFORD IN THE LEGS AND CHEST AREA, NOT CAUSING ANY INJURY TO OFC SANFORD. OFC SANFORD WITH THE ASSISTANCE OF OFC RICHMOND RETRAINED (ED1)'S LEGS AND FEET. (ED1) WAS PLACED ONTO THE BACK-BOARD WITH THE ASSISTANCE OF OFFICERS ON-SCENE AS WELL AS EMS. (ED1) CONTINUED TO KICK AND BE COMBATANT DURING THE ENTIRE TIME SHE WAS IN ME PRESENCE. I RODE WITH EMS TO METROPOLITAN METHODIST HOSPITAL. (ED1) WAS LEFT IN THE CARE OF THE HOSPITAL STAFF.

```
PDCR99058603970[illegible]          CITY OF SAN ANTONIO          PAGE 01
   NEXT CASE:                          CASE  RECORD
DISP  SVC   CASE    X-ASGM   OFFENSE-DESC     DATE    TIM   USER-ID STATION UNITS
 F         05860397             26  INJ/SK PR 12-06-05 1518  XXXX      **      **
   R-CASE                    000026  INJ/SK PER
 PUNIT DIST  OVR HSE/BLK STREET/PLACE   APT NO  BLDG  INTERSECTION  TYP PRI 911
        4160             COMMERCE ST E                NEW BRNFLS N   I
        4160             COMMERCE ST E                NEW BRNFLS N   I

COMPLAINANT/REPORTED BY    HSE NO STREET  NAME  APT NO  TELEPHONE    CASE FLAG
PERCTY, DOTSON             UNK                          [redacted]

DETAILS:
C STATED HIS DAUGHTER IS SITTING AT THE BUS STOP C STATED SHE IS A
CTING CRAZY POSSIBLE PHYSIC PATIENT CHECK ON WELFAIR SHE HAS A COAT ON GRY
IN COLOR ADVISE ON EMS

LIC/          LIS/     VYR/     VMA/      VMO/      VST/     VCO/      OVER/
DISPOSITION 12-07-05 2218 S333 99 ISN 1068987  LAST UPD 12-07-05 2218 S333 99
         REPORT FINALIZED
                  * NO OFFENSE REPORT FOR CASE RECORD *
```

EXHIBIT 1

# TEXAS COMMISSION ON JAIL STANDARDS

EXECUTIVE DIRECTOR
Brandon S. Wood

P.O. Box 12985
Austin, Texas 78711
Voice: (512) 463-5505
Fax: (512) 463-3185
http://www.tcjs.state.tx.us
info@tcjs.state.tx.us

EXHIBIT 2

July 24, 2017

Dear Sheriff:

The 85th Legislature passed, and Governor Abbott signed SB 1849, commonly referred to as "The Sandra Bland Act" which will require changes to Minimum Jail Standards. The formal adoption of the amended minimum jail standards will progress through normal rulemaking procedures but in order to meet the mandated deadlines of the bill, this process will begin on August 3, 2017. Public comment on the proposed rules will be accepted, considered and taken into account before the final rules are adopted. Some of these changes will require a change to your operational plans. Please do not submit any changes to your operational plans until **AFTER** the Commission has adopted the final version of the proposed rules. The commission will provide you with instructions on how and when to submit your operational plans for review and approval. Please find below a summary of the enacted legislation and action required by counties.

Item 1

CCP Art. 16.22 has been amended to read as follows, "Not later than 12 hours after receiving credible information that may establish reasonable cause to believe that a defendant committed to the sheriff's custody has a mental illness or is a person with an intellectual disability, including observation of the defendant's behavior immediately before, during, and after the defendant's arrest and the results of any previous assessment of the defendant, the sheriff shall provide written or electronic notice of the information to the magistrate."

> *This changes the notification requirement from 72 hours to 12 hours. This amendment to Art. 16.22 will not require a change to standards but will go into effect **September 1, 2017.***

Item 2

To ensure the safety of prisoners, a county jail is required to:

1. give prisoners the ability to access a mental health professional at the jail through a telemental health service 24 hours a day;

2. give prisoners the ability to access a health professional at the jail or through a telehealth service 24 hours a day or, if a health professional is unavailable at the jail or through a telehealth service, provide for a prisoner to be transported to access a health professional;

3. install automated electronic sensors or cameras to ensure accurate and timely in-person checks of cells or groups of cells confining at-risk individuals.

Judge Bill Stoudt, Longview, Chair
Jerry W. Lowry, New Caney, Vice Chair
Larry S. May, Sweetwater
Sheriff Dennis D. Wilson, Groesbeck
Sheriff Kelly Rowe, Lubbock
Dr. Esmaeil Porsa, M.D., Parker
Commissioner Ben Perry, Waco
Duane Lock, Southlake
Melinda E. Taylor, Austin

"The Commission on Jail Standards welcomes all suggestions and will promptly respond to all complaints directed against the agency or any facilities under its purview".

*To empower local government to provide safe, secure and suitable local jail facilities through proper rules and procedures while promoting innovative programs and ideas*

# TEXAS COMMISSION ON JAIL STANDARDS

EXECUTIVE DIRECTOR
Brandon S. Wood

P.O. Box 12985
Austin, Texas 78711
Voice: (512) 463-5505
Fax: (512) 463-3185
http://www.tcjs.state.tx.us
info@tcjs.state.tx.us

EXHIBIT 2

*Counties will be required to provide access to a mental health professional at the jail through a telemental health service 24 hours a day if on-site access is not available 24 hours a day.*

*Counties will also be required to provide access to a health professional at the jail or through a telehealth service 24 hours a day. If a health professional is unavailable in person or via telehealth, the county will provide transport to access a health professional. These two sections mean counties will be required to provide access to mental health and medical health care 24 hours a day, either on-site or through tele-med.*

*Counties will also be required to have either electronic sensors or cameras that can demonstrate checks are being made in your high risk areas (holding, detox, violent and separation cells.) The legislature created an account to be managed by TCJS called the Prisoner Safety Fund. Counties that operate a jail that is 96 beds or less may apply for grants to assist in paying for the capital improvement upgrades required (electronic sensors and possibly cameras.) This program is currently being developed and additional information on how to apply and what will be covered will be provided after completion of a survey that will be conducted by the commission.*

*TCJS is required to adopt rules and procedures for the above requirements not later than **September 1, 2018.** A county jail shall comply with any rule or procedures for the above requirements by **September 1, 2020.***

Item 3

TCJS is required to adopt rules and procedures establishing minimum jail standards regarding the continuity of prescription medications for the care and treatment of prisoners no later than **January 1, 2018.** The rules and procedures shall require that a qualified medical professional review as soon as possible any prescription medication a prisoner is taking when the prisoner is taken into custody.

*Proposed rule language will be considered **August 3, 2017.** Counties will have the opportunity and are encouraged to comment on the proposed language for this section prior to **November 2, 2017.** All comments will be reviewed and considered before the rule is adopted and becomes effective on **January 1, 2018.***

Item 4

On or before the fifth day of each month, the sheriff of each county shall report to TCJS the number of serious incident occurring the previous month involving a prisoner in the county jail: Suicide; Attempted suicide; Death; A serious Bodily injury, as defined by Section 1.07, Penal Code; An assault; An escape; A sexual assault; Any use of force resulting in bodily injury, as that term is defined by Section 1.07, Penal Code.

Judge Bill Stoudt, Longview, Chair
Jerry W. Lowry, New Caney, Vice Chair
Larry S. May, Sweetwater
Sheriff Dennis D. Wilson, Groesbeck
Sheriff Kelly Rowe, Lubbock
Dr. Esmaeil Porsa, M.D., Parker
Commissioner Ben Perry, Waco
Duane Lock, Southlake
Melinda E. Taylor, Austin

"The Commission on Jail Standards welcomes all suggestions and will promptly respond to all complaints directed against the agency or any facilities under its purview".
*To empower local government to provide safe, secure and suitable local jail facilities through proper rules and procedures while promoting innovative programs and ideas*

# TEXAS COMMISSION ON JAIL STANDARDS

EXECUTIVE DIRECTOR
Brandon S. Wood

P.O. Box 12985
Austin, Texas 78711
Voice: (512) 463-5505
Fax: (512) 463-3185
http://www.tcjs.state.tx.us
info@tcjs.state.tx.us

EXHIBIT 2

*TCJS is required to prescribe a form for the report by* ***January 1, 2018.*** *This form is being developed and will be reviewed and tested by selected counties.*

Item 5

On the death of a prisoner in a county jail, the Texas Commission on Jail Standards shall appoint a law enforcement agency, other than the local law enforcement agency that operates the county jail, to investigate the death as soon as possible.

*While counties may have their own Criminal Investigators or Internal Affairs Divisions investigate deaths in custody, TCJS is mandated to appoint an independent, outside agency to investigate the death. TCJS is required to adopt any rules necessary relating to the appointment of a law enforcement agency, including rules relating to cooperation between law enforcement agencies and procedures for handling evidence. TCJS is collaborating with DPS and other law enforcement agencies in an effort to create a workable solution. Draft language and ideas will be provided for comment and review before adoption of any rules which is required by* ***January 1, 2018.***

Item 7

Not later than **March 2018,** TCOLE shall develop and TCJS shall approve an examination for a person assigned to the jail administrator position. TCJS is mandated to adopt a rule requiring a person, other than the sheriff, assigned to the jail administrator position to pass the examination not later than the 180th day after the date the person is assigned to that position. A person who fails the exam will be immediately removed from the position and may not be reinstated until the person passes the exam. The sheriff shall perform the duties of the jail administrator position at any time there is not a person available who satisfies the examination.

*TCJS and TCOLE have created a workgroup, made up of current and former jail administrators to create the test. It will consist of questions about jail operations; Areas covered during TCJS Annual Inspection; Management procedures; TCOLE Licensing requirements; and other pertinent areas. A study guide will be provided to assist students prior to taking the examination. The guide will prepare the student with the knowledge and areas of study they need to get ready for the exam.*

*Persons serving as Jail Administrators on or before March 1, 2018 will be grandfathered and not required to take the exam. This exemption expires if: a jail administrator accepts the position of jail administrator in another county, or a new/incoming sheriff appoints the existing jail administrator to the same position.*

Judge Bill Stoudt, Longview, Chair
Jerry W. Lowry, New Caney, Vice Chair
Larry S. May, Sweetwater
Sheriff Dennis D. Wilson, Groesbeck
Sheriff Kelly Rowe, Lubbock
Dr. Esmaeil Porsa, M.D., Parker
Commissioner Ben Perry, Waco
Duane Lock, Southlake
Melinda L. Taylor, Austin

"The Commission on Jail Standards welcomes all suggestions and will promptly respond to all complaints directed against the agency or any facilities under its purview".
*To empower local government to provide safe, secure and suitable local jail facilities through proper rules and procedures while promoting innovative programs and ideas*

# TEXAS COMMISSION ON JAIL STANDARDS

EXECUTIVE DIRECTOR
Brandon S. Wood

P.O. Box 12985
Austin, Texas 78711
Voice: (512) 463-5505
Fax: (512) 463-3185
http://www.tcjs.state.tx.us
info@tcjs.state.tx.us

EXHIBIT 2

Item 8

Occupations Code 1701.310(a) is amended to include that the required county jailer training course include at least eight hours of mental health training approved by TCOLE and the Texas Commission on Jail Standards. Current licensed jailers have until August 31, 2021 to take an approved eight hour mental health training course. New Jailers hired on and after September 1, 2017 will receive the required mental health training while in jail school.

> *TCJS will develop a free course that meets this requirement and employ three mental health trainers to assist the current licensed jailers to meet the training requirement by August 31, 2021. Additional details regarding classes will be provided by December 1, 2017.*

If you have any questions regarding this letter or any other issue, please do not hesitate to contact my office.

Sincerely,

Brandon S. Wood
Executive Director

Judge Bill Stoudt, Longview, Chair
Jerry W. Lowry, New Caney, Vice Chair
Larry S. May, Sweetwater
Sheriff Dennis D. Wilson, Groesbeck
Sheriff Kelly Rowe, Lubbock
Dr. Esmaeil Porsa, M.D., Parker
Commissioner Ben Perry, Waco
Duane Lock, Southlake
Melinda E. Taylor, Austin

"The Commission on Jail Standards welcomes all suggestions and will promptly respond to all complaints directed against the agency or any facilities under its purview".
*To empower local government to provide safe, secure and suitable local jail facilities through proper rules and procedures while promoting innovative programs and ideas*

**EXHIBIT 3**

INTAKE #: 1939433

MAG NO. 397258

CITY: ______
COURT NO: ______
COUNTY/STATE: ______
WARRANT NO: ______
ASSIGN/CASE NO: ______
ARREST DATE: 20180717
ARREST TIME: 1105

THE STATE OF TEXAS
COUNTY OF BEXAR

MAGISTRATE WARNING

BEFORE ME, THE UNDERSIGNED, MAGISTRATE OF BEXAR COUNTY, TEXAS, ON THE ___ DAY OF JUL 17 2018, AT 545 O'CLOCK A.M./P.M. AT THE MAGISTRATE COURT APPEARED DOTSON-STEPHENS, JANICE K AT WHICH TIME I INFORMED THE ACCUSED OF THE CHARGE CRIMINAL TRESPASS-PRIVATE PROP , FILED AGAINST HIM/HER AND OF ANY AFFIDAVIT, COMPLAINT, OR VERIFICATION OF A WARRANT FILED THEREWITH.

THE DEFENDANT WAS INFORMED:

1. OF HIS/HER RIGHT TO REMAIN SILENT;
2. OF HIS/HER RIGHT TO RETAIN COUNSEL;
3. OF HIS/HER RIGHT TO REQUEST THE APPOINTMENT OF COUNSEL IF HE/SHE IS INDIGENT AND CAN NOT AFFORD COUNSEL;
4. THAT HE/SHE WILL BE ALLOWED A REASONABLE TIME AND OPPORTUNITY FOR COUNSEL;
5. OF HIS/HER RIGHT TO HAVE AN ATTORNEY PRESENT DURING AN INTERVIEW WITH PEACE OFFICERS;
6. OF HIS/HER RIGHT TO TERMINATE AN INTERVIEW AT ANY TIME;
7. THAT HE/SHE IS NOT REQUIRED TO MAKE ANY STATEMENT;
8. THAT ANY STATEMENT MADE BY HIM/HER MAY BE USED AGAINST HIM/HER AT TRIAL AND IN COURT;
9. OF HIS/HER RIGHT TO HAVE AN EXAMINING TRIAL;
10. IF FROM A FOREIGN NATION, THE RIGHT TO ACCESS HIS/HER CONSULATE;
11. OF THE PROCEDURES FOR REQUESTING A COURT APPOINTED ATTORNEY
    - A. THAT AN APPLICATION NEEDS TO BE COMPLETED TO DETERMINE IF HE/SHE QUALIFIES FOR COURT APPOINTED COUNSEL;
    - B. THAT A CLERK WILL ASSIST HIM/HER IN FILLING OUT THE APPLICATION
    - C. THAT AN AFFIDAVIT NEEDS TO BE SIGNED;
    - D. THAT AN AFFIDAVIT IS A WRITTEN OR PRINTED DECLARATION OR STATEMENT OF FACTS MADE VOLUNTARILY AND CONFIRMED BY OATH BEFORE A PERSON HAVING AUTHORITY TO ADMINISTER SUCH OATH;
    - E. THAT HE/SHE MUST QUALIFY FOR COURT APPOINTED COUNSEL;
    - F. THAT IF HE/SHE MEETS INDIGENCE STANDARDS HE/SHE WILL QUALIFY FOR COURT APPOINTED COUNSEL;
    - G. UPON QUALIFICATION PRETRIAL SERVICES WILL PROVIDE THE NAME AND PHONE NUMBER OF THE ATTORNEY; AND
    - H. THAT COURT APPOINTED COUNSEL SHOULD CONTACT HIM/HER BY THE END OF THE FIRST WORKING DAY AFTER APPOINTMENT.

THE MAGISTRATE ASKED WHETHER THE PERSON WANTS TO REQUEST APPOINTED COUNSEL.
THE ACCUSED DOES / DOES NOT WANT TO REQUEST COURT APPOINTED COUNSEL.

________ YOU ARE REMANDED WITHOUT BOND.

BOND SET: $ 300.00

WARNING RECEIVED: (THIS IS NOT AN ADMISSION OF GUILT)

______________________ X unable to sign (un coop)
MAGISTRATE / DATE ACCUSED / DATE

JUL 17 2018 JUL 17 2018

EXHIBIT 4

File

200 N. Comal, MT-01
San Antonio, Texas 78207

Phone: (210) 335-6260
Fax: (210) 335-6193

UniversityHealthSystem.com

CC 582487

Monday, August 20,2018

FILED
____ O'CLOCK ____ M
SEP 04 2018
DONNA KAY MCKINNEY
District Clerk, Bexar County, Texas
BY Samantha Pacheco DEPUTY

The Honorable Andrew W. Carruthers
Judge, Criminal Law Magistrate
Bexar County Courthouse
100 Dolorosa
San Antonio, TX 78205

Re: Janice Dotson-Stephens
DOB: 04/02/1957
Sid#: 217377

This individual referenced above may be unable to assist her attorney in the preparation of her defense due to mental illness and may require a competency evaluation.

Respectfully,

Cesar Garcia, MD
Psychiatrist






**EXHIBIT 5**

# ORDER FOR COMPETENCY EVALUATION

CC582687

STATE OF TEXAS
VS.
JANICE DOTSON-STEPHENS

IN THE COUNTY COURT
AT LAW #4
BEXAR COUNTY, TEXAS

The University Health System Correctional Health Care Services, is hereby **ORDERED** to perform the following evaluation(s) on the below named defendant and submit to the Court their report in accordance with Article 46B.025, C.C.P. to include its opinion as to whether the defendant is competent to stand trial or explain why the expert is unable to state such an opinion. The report may not state the expert's opinion on the defendant's ability at the time of the alleged offense, if in the opinion of the expert the defendant is incompetent to proceed.

The Defendant is hereby **ORDERED** to submit to examination for purpose of determining competency to stand trial.

**NAME:** JANICE DOTSON-STEPHENS

**CAUSE NUMBER(S):** CC582687

**SID:** 217377

**CHARGE(S):** CRIMINAL TRESPASS – PRIVATE PROP

**COURT:** CC4 **STATUS**: ***PENDING***

**DEFENDANT'S PHONE # AND ADDRESS IF OUT ON BOND**: ***JAIL***

**ATTORNEY'SNAME AND PHONE NUMBER**: JERRY VALDEZ 210-737-2992

Said report(s) shall be filed with the trial court by: **SEPTEMBER 27TH, 2018.**

**ORDERED this 27TH DAY of AUGUST, 2018.**

[signature]

**JUDGE PRESIDING**

* If available, attach copy of offense report, and defendant's Motion for Psychiatric Evaluation.

EXHIBIT 6

# Jail chief abruptly resigns from the Bexar County Sheriff's Office

By Fares Sabawi
Updated 4:46 pm CDT, Friday, September 28, 2018

Photo: Bexar County Sheriff's Office
Bobby Hogeland resigned from his post as assistant deputy chief overseeing the adult detention bureau Friday.

The assistant chief deputy who oversees the Bexar County Jail resigned Friday from the Bexar County Sheriff's Office.

Bobby Hogeland's resignation was effective Friday, sheriff's office spokesman Johnny Garcia confirmed.

In his resignation letter, Hogeland wrote that "in short, other opportunities presented themselves." He also expressed pride over recent accomplishments he oversaw, that included setting up a mental health evaluation team and the contraband abatement team.



Sheriff Javier Salazar plans to open a national search for the best person to run the jail. He said he's looking for a candidate that's tough on discipline, good at maintaining morale and good at public speaking.

In the meantime, deputy chief Ruben Vela, who has been with the sheriff's office for more than 30 years, will assume interim responsibilities until the post is filled.

Salazar said that he did not speak to Hogeland about his resignation, but wished him well.

"I've known Bobby Hogeland for probably 15 to 20 years," he said, dating back to Salazar's time with San Antonio police and Hogeland's time as a U.S. Marshal. "I have no doubt that what opportunity he found, he will do outstanding in it."

Hogeland's resignation comes amid a troubling year for the sheriff's office, which has struggled with escape attempts from the jail and the arrest of 20 deputies in 2018, the majority of whom were assigned to the jail.

The resignation also came after local reports indicated the sheriff's office recently spent roughly $54,000 on office chairs.

Salazar said he cannot speak for Hogeland, but that those factors were not mentioned in his resignation letter.

Salazar said Hogeland was "operating under what was allowable" when he bought the chairs.

"That was an expensive undertaking," Salazar said. "The deputies up there ... don't think for a second that they're sitting in the lap of luxury."

Salazar said the jailers work in a high stress environment, and sometimes have to stay at their post for up to 16 hours.

"I believe the chief was trying to give them a comfortable place to sit," Salazar said. Bexar County Judge Nelson Wolff issued a statement saying that he he had "serious concerns regarding the purchase price," but that the purchasing process was appropriate.



"These purchased items were bid through a competitively bid contract, the Texas Multiple Award Schedule, a procurement program by the State of Texas," Wolff said in a statement. "All County items purchased are vetted as appropriate by the elected or appointed official of that department in coordination with the Purchasing Agent, another independently appointed individual as well as County staff."

Wolff also pointed out the chairs came with a lifetime warranty and replaced others that were worn out.

While Wolff wasn't clear on all the details behind Hogeland's resignation, he said the chairs were **one reason among many** that he's leaving.

**"He was a nice guy but he didn't have any administrative experience," he said. "[Hogeland] came straight from the U.S. Marshal's Service."**

Hogeland seemed to refer to those allegations briefly in his resignation letter.

"I will always stand by my comments that the deputies assigned to the detention bureau work extremely hard each and every day and it is incumbent upon the administration to provide them with the best equipment and tools necessary to do their job effectively and safely to keep our community safe," he wrote. "I am hopeful that these measure will continue."

The county has been reviewing the purchasing process since Sept. 11 "to add additional safeguards to ensure that county purchases are appropriate," Wolff also said.

*Fares Sabawi covers crime in San Antonio and Bexar County for* mySA.com*. Read more of his stories* here*. | fsabawi@mysa.com | Twitter:* @FaresInSA

EXHIBIT 7

BEXAR COUNTY
invites applications for the position of:

## Assistant Chief - Jail Administrator - Sheriff's Office

**SALARY:** $8,230.00 Monthly

**OPENING DATE:** 12/21/18

**CLOSING DATE:** 01/04/19 11:59 PM

**SUMMARY:**

Under administrative direction, is responsible for the administration of safety and security for all Bexar County Detention facilities. Position manages critical incidents and fosters a healthy environment; leads the assessment and correction of all safety and security standards and ensures compliance with all applicable standards required. Position oversees the management of inmates, acts as the subject matter expert for jail standards and inspections, internal prison intelligence, inmate treatment and providing immediate remedies for critical incidents.

**DUTIES AND RESPONSIBILITIES:**

- Formulates and implements policies, programs, rules and regulations to ensure effective administration of the jail; develops and implements standard operating procedures to address inmate behavior and management of staff
- Provides direct supervision and monitors performance of all members of the Adult Detention Center and ensures appropriate levels of staffing and proper management of inmates and detention staff
- Briefs Sheriff daily on operations activities and status of daily operations and incidents; attends Sheriff Command briefings to report on operational and staffing issues and updates; responsible for daily supervisor meetings to discuss problems/concerns, provide advice or direction, disseminate new or adjusted directives and regulations
- Oversees the regular formal and informal inspections of the jail facilities; coordinates and facilitates State and Federal inspections and implements recommended changes
- Formulates and implements programs and policies to alleviate deficiencies; plans, directs and coordinates work plans, project and program areas of responsibility by and through direct reports
- Ensures activities are performed in accordance with all applicable laws, regulations, policies and procedures; ensures the proper management of all required programs related to the housing, booking, and releasing of inmates.
- Ensures that inmates are informed of jail rules, proper inmate release dates are accomplished, the detentions facility maintains fire and safety codes as required, and responsibilities related to the transportation and care of inmates are being followed
- Assumes responsibility of all services, activities, inmate records, inmate transfers, inmate medical health, inmate mental health and treatment; reports and identify areas which require adjustment or action
- Resolves day-to-day operational problems and concerns of staff, outside agencies and the public to ensure prompt response and service; produces and maintains accurate and timely information on

EXHIBIT 7

the daily operations of the jail

- Communicates with a variety of agencies and administrators both internal and external regarding the detention operations and management; performs community relations and citizen relations work as needed
- Researches and evaluates Jail safety problems or concerns and prepares information to be utilized in clarifying or resolving issues. Reports findings and/or conclusions to Sheriff
- Collects, analyzes, researches, compiles, current and historical data for various reports on inmate housing and other jail related information
- Manages by example the necessary techniques and responsibilities of a Deputy Sheriff Detention Officer
- Performs other duties as required

**MINIMUM QUALIFICATIONS:**

- Graduation from an accredited college or university with a Bachelor's degree in Criminal Justice, Public Administration, Business Management or other managerial field; ten (10) years of supervisory or managerial experience and five (5) years' experience working in jail administration; or a combination of education and experience
- Knowledge of the principles and practices of business management, public administration and jail administration; knowledge of the principles and practices of management and supervision in order to effectively operate a bureau within the Sheriff's Office; knowledge of pertinent federal, state, and county laws, codes and the policies of the Sheriff in order to make appropriate decisions concerning Adult Detention Center operations; knowledge of the principles and practices of budget formulation and execution in order to plan for and oversee the financial operation of a bureau; and knowledge of the principles and practices of collective bargaining and good personnel (human resources) management in order to effectively deploy human capital.
- Skill in creating and maintaining effective working relationships both within and outside the Sheriff's Office; and skill in communicating with a variety of agencies, administrators (stakeholders) regarding Bexar County Sheriff's Office operations, e.g. Texas Department of Criminal Justice, Texas Commission on Jail Standards, Federal Bureau of Investigation, Homeland Security, the Bexar County District Attorney's Office, San Antonio Police Department, University Health System, various law enforcement agencies, members of the clergy, medical professionals, regulatory organizations.
- Ability to lead and retain motivated employees; ability to conduct complex analytical studies of agency operations and functions, using a wide variety of specialized computer systems to prepare data for program evaluation (Data-driven decision making); ability to make verbal and written presentations in a clear and concise manner; ability to plan and organize manpower and financial resources into an effective and efficient organization; ability to gather and analyze data, come to a conclusion and develop a plan of action to solve problems; ability to evaluate situations, based on training and experience, and make good decisions; and ability to establish and maintain effective working relationships with subordinates, co-workers, other County employees, Department/Division Heads, Elected/Appointed Officials, outside agencies and the general public.
- Physical requirements include occasional lifting/carrying of 5-10 lbs.; visual acuity, speech and hearing; hand and eye coordination and manual dexterity necessary to operate computer keyboard and basic office equipment. Subject to handling, walking, sitting, standing, bending and reaching to perform the essential functions
- Must possess and maintain a valid Texas Driver's License
- Must pass a psychological examination and a criminal background check by the Sheriff's Office
- Must satisfy the requirements of the Jail Administrator Examination as defined by TCOLE within 180 days of hire
- Must pass certification as a Texas Jailer by TCOLE within 180 days of hire date and maintain

EXHIBIT 7

certification

- Must clear a pre-employment physical and a pre-employment drug screen test
- May be required to work more than 40 hours during the workweek

**Working Environment and Physical Demands:**

- Working conditions are primarily in an office within a jail environment with occasional exposure to irate or hostile individuals

## SUPPLEMENTAL INFORMATION:

*Computers are available to view current job postings and to complete the application process at 211 S. Flores Street, San Antonio, TX 78204, between the hours of 8:00 a.m. to 5:00 p.m., Monday through Friday. Phone: 210.335.2545*

**THIS IS AN EQUAL OPPORTUNITY EMPLOYER**

Bexar County is an Equal Opportunity Employer and committed to Workplace Diversity. We are committed to providing equal opportunity for protected veterans and individuals with disabilities. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

---

APPLICATIONS MAY BE FILED ONLINE AT: http://www.bexar.org/hr/

211 S. Flores Street
San Antonio, TX 78204

Position #2018-00488
ASSISTANT CHIEF - JAIL ADMINISTRATOR - SHERIFF'S OFFICE
VR

---

**Assistant Chief - Jail Administrator - Sheriff's Office Supplemental Questionnaire**

* 1. Which best describes your highest level of education completed?

- ☐ High School Diploma or G.E.D
- ☐ Associates Degree
- ☐ Bachelor's Degree
- ☐ Master's Degree
- ☐ None

* 2. Which best describes your college major?

- ☐ Criminal Justice
- ☐ Public Administration
- ☐ Business Management

EXHIBIT 7

- Other Major
- No Major

* 3. Which best describes your years of supervisory or managerial experience?

- No Experience
- 1 Year
- 2 Years
- 3 Years
- 4 Years
- 5 Years
- 6 Years
- 7 or more Years

* 4. Which best describes your years' experience working in jail administration?

- No Experience
- 1 Year
- 2 Years
- 3 Years
- 4 Years
- 5 Years
- 6 Years
- 7 or more Years

* 5. Do you have a valid Texas driver's license?

- Yes
- No

* 6. Are you able to clear a psychological examination and a criminal background check by the Sheriff's Office?

- Yes
- No

* 7. Do you understand that you must be able to pass certification as a Texas Jailer, and satisfy the requirements of the Jail Administrator Examination as defined by TCOLE within 180 days of hire?

- Yes
- No

* 8. Are you able to secure and maintain a pre-employment physical and a pre-employment drug screen test?

- Yes
- No

* 9. Are you able to work more than 40 hours during the work week?

- Yes
- No

* 10. Do you have skill in communicating with a variety of agencies and administrators both internal and external regarding the detention operations and management?

- Yes
- No

* 11. Do you have the ability to conduct complex analytical studies of agency operations and functions, using a wide variety of specialized computer systems to prepare data for program evaluation (data-

EXHIBIT 7

driven decision making)?

- ☐ Yes
- ☐ No

12. Please provide details about where you obtained your experience working in a jail/adult detention center. (Size of jail, number of beds managed and average inmate/jail population)

13. Please provide any contributions and or processes put in place to reduce jail population.

14. If previous experience was in a unionized environment, what contribution did you make to build and manage the relationship with the union?

15. Please provide detail about your participation if any to include your role in dealing with negotiations working towards a collective bargaining agreement.

* Required Question



## Non-Compliant Jails

Home :: Publications :: Non-Compliant Jails

The counties listed below have been found in non-compliance with Texas Minimum Jail Standards as codified in the Texas Administrative Code, Title 37, Part 9. Counties will be listed upon verification that the county has received the official notice of non-compliance, and counties will be removed immediately upon attaining compliance. Counties with more than one report listed indicate that more than one inspection has been conducted and additional areas of non-compliance were identified.

- Bexar County
- Comanche County
- Crockett County
- Fannin (P)
- Fannin (P) (Special)
- Fisher County
- Frio County
- Goliad County
- Harris County
- Harris County (Special)
- Harrison County
- Hunt County
- Jim Hogg County
- Kinney County
- Kinney County (Special)
- Liberty County
- Limestone County (Special)
- Maverick-P (Special)
- McLennan-P (Special)
- McLennan-P (Special) #2
- Robertson County (Special)
- Robertson County (Re-inspection)
- Robertson County
- Shelby County (Special)
- Sutton County

Non-Compliant Jails - Texas Commission on Jail Standards
3/13/19, 10:08 AM

EXHIBIT 8

Van Zandt County
Victoria County
Waller County

The documents linked above are in PDF format, the free Adobe Acrobat Reader can be downloaded here and used to view these documents.

HOME SITEMAP SEARCH CONTACT US

Accessibility Policy Link Policy Privacy and Security Policy Where the Money Goes
Waste & Fraud Texas Veterans Portal

300 West 15th Street • Suite 503 • Austin, Texas 78701
512.463.5505 • info@tcjs.state.tx.us

https://www.tcjs.state.tx.us/index.php?linkID=340 Page 2 of 2


EXHIBIT 9

# Texas Commission on Jail Standards

Bexar County Jail

San Antonio, Texas

February 19-22, 2019
Date(s) of Inspection

SUBJECT: INSPECTION REPORT

State Law requires periodic inspections of county jail facilities (VTCA, Local Government Code, Chapter 351, VTCA, Government Code, Chapter 511; Chapter 297.8, Texas Commission on Jail Standards).

☑ The facility was inspected on the date(s) indicated above, and it was determined that deficiencies exist. You are urged: (1) to give these areas of noncompliance your serious and immediate consideration; and (2) to promptly initiate and complete appropriate corrective measures. The Commission is available to discuss or assist you with the appropriate corrective measures required.

Failure to initiate and complete corrective measures following receipt of the Notice of Noncompliance may result in the issuance of a Remedial Order (Chapter 297.8, et seq.).

☐ This facility was inspected on the date(s) indicated above. There were no deficiencies noted and upon review of this report by the Executive Director of the Texas Commission on Jail Standards, a certificate of Compliance may be issued per the requirements of VTCA, Chapter 511 and Texas Minimum Jail Standards.

Authenticated:

Jennifer Shumake, TCJS Inspector

William Phariss, TCJS Inspector

RECEIVED

FEB 25 2019

Texas Commission on Jail Standards

Inter-Office Use Only

| Received by: Tammie Linda | Date 2.25.19 |
|---|---|
| Reviewed by: Shannon J Herklotz | Date 2/25/2019 |

cc: Judge
Sheriff

Individuals and/or entities regulated by the Texas Commission on Jail Standards shall direct all complaints regarding the commission procedures and functions to the Executive Director at: P.O. Box 12985 Austin, Texas 78711 (512) 463-5505 Fax (512) 463-3185 or at our agency website at www.tcjs.state.tx.us .

**EXHIBIT 9**

# ANNUAL JAIL REPORT

County: Bexar

Sheriff: Javier Salazar
email: j.salazar@bexar.org

Judge: Nelson Wolff
email: nwolff@bexar.org

Jail Administrator: Avery Walker
email: a.walker@bexar.org

Inspector: Jennifer Shumake
William Phariss

Last Inspection: January 17-19, 2018 Compliant: No Inspection Date(s): February 19-22, 2019

Remedial Order: N/A Effect:

Reportable Incidents (Previous 12 month history)

| | | | |
|---|---|---|---|
| Fires | 0 | Escapes | 4 |
| Deaths | 5 | Walkaway | 0 |
| Suicides | 1 | Secured | 4 |

Contract Inmates Housed AT

| | |
|---|---|
| County1 | |
| County2 | |
| County3 | |
| County4 | |
| County5 | |
| County6 | |

Date Plans Approved: February 4, 2013

**1. *Facility Name*** Bexar County Jail
Address: 200 N. Comal St. San Antonio Tx Zip Code: 78207
Phone #: (210) 335-6219 Fax #: (210) 335-6199
Built: 1988 Renovated: 1998 Addition: 1998
Type: Max Number of Variances: 8
Drill Time: 1min51sec
Facility Capacity: 3,342
Average Daily Population: 2,641.33
Housing Total this Date: 2,816
Holding Total this Date: 75

**2. *Facility Name*** Bexar County Jail Annex
Address: 200 N. Comal St. San Antonio Tx Zip Code: 78207
Phone #: (210) 335-2666 Fax #: (210) 335-2495
Built: 1993 Renovated: N/A Addition: 2001 & 2008
Type: Min/Med/Max Number of Variances: 4
Drill Time: 1min24sec
Facility Capacity: 1733
Average Daily Population: 1580.58
Housing Total this Date: 1,345
Holding Total this Date: N/A

**3. *Facility Name*** Bexar County Justice Center (Court Holding)
Address: 100 Dolorosa, San Antonio Zip Code: 78207
Phone #: (210) 335-2688 Fax #: (210) 335-2877
Built: 1991 Renovated: N/A Addition: 2012
Type: Number of Variances:
Drill Time: N/A Court
Facility Capacity: 399
Average Daily Population: N/A
Housing Total this Date: N/A
Holding Total this Date: 134

***Housing Capacity*** 5,075

| | Cells | Capacity |
|---|---|---|
| Sep Cells | 11 | 11 |
| Single Cells | 372 | 372 |
| M.O. Cells | 1037 | 2202 |
| Dorms | 48 | 2,490 |
| Neg Press Cells | 0 | 0 |
| Medical Cells | 52 | 52 |

Note: Negative Pressure Cells and medical Cells are in the above count Sep. Dorms area

***Holding Capacity*** 434

| | Cells | Capacity |
|---|---|---|
| Holding Cells | 51 | 464 |
| Classification Cells | 2 | 8 |
| Violent Cells | 2 | 2 |

***Construction Security Level***

| | |
|---|---|
| Minimum Capacity | 236 |
| Medium Capacity | 1560 |
| Maximum Capacity | 2767 |

**Females** 615 (Female Population Today)
# of Cells: 17
# of Bunks: 709

**Contract Inmates**
100 + Capacity (30% + Non - TX)
☐ Yes ☑ No

***Population:*** (During inspection) ***Housing*** 4,161 ***Hold/Detox/Violent*** 75 ***Total System Population*** 4,236

Total Inspection Time: 44.5 hours (two inspectors) ***Total Average Daily Population*** 4287.83

Sheriff

RECEIVED FEB 25 2019 Texas Commission on Jail Standards

Interview with Court Representative ☑ Yes ☐ No

Jail Administrator

Commissioners Court Representative

Rev. 1/05/2011

Inspection Date(s): February 19-22, 2019

**EXHIBIT 9**

Inspection Date(s): February 19-22, 2019

4. ***Facility Name*** Bexar County Justice Center (Court Holding)
Address 100 Dolorosa San Antonio, TX Zip Code 78207
Phone # 210-335-2686 Fax # (210) 335-2677
Built 11991 Renovated N/A Addition ____
Type ____ Number of Variances ____

Drill Time test
Facility Capacity 289
Average Daily Population N/A
Housing Total this Date N/A
Holding Total this Date 115

5. ***Facility Name*** ____
Address ____ Zip Code ____
Phone # ____ Fax # ____
Built ____ Renovated ____ Addition ____
Type ____ Number of Variances ____

Drill Time ____
Facility Capacity ____
Average Daily Population ____
Housing Total this Date ____
Holding Total this Date ____

6. ***Facility Name*** ____
Address ____ Zip Code ____
Phone # ____ Fax # ____
Built ____ Renovated ____ Addition ____
Type ____ Number of Variances ____

Drill Time ____
Facility Capacity ____
Average Daily Population ____
Housing Total this Date ____
Holding Total this Date ____

7. ***Facility Name*** ____
Address ____ Zip Code ____
Phone # ____ Fax # ____
Built ____ Renovated ____ Addition ____
Type ____ Number of Variances ____

Drill Time ____
Facility Capacity ____
Average Daily Population ____
Housing Total this Date ____
Holding Total this Date ____

8. ***Facility Name*** ____
Address ____ Zip Code ____
Phone # ____ Fax # ____
Built ____ Renovated ____ Addition ____
Type ____ Number of Variances ____

Drill Time ____
Facility Capacity ____
Average Daily Population ____
Housing Total this Date ____
Holding Total this Date ____

9. ***Facility Name*** ____
Address ____ Zip Code ____
Phone # ____ Fax # ____
Built ____ Renovated ____ Addition ____
Type ____ Number of Variances ____

Drill Time ____
Facility Capacity ____
Average Daily Population ____
Housing Total this Date ____
Holding Total this Date ____

10. ***Facility Name*** ____
Address ____ Zip Code ____
Phone # ____ Fax # ____
Built ____ Renovated ____ Addition ____
Type ____ Number of Variances ____

Drill Time ____
Facility Capacity ____
Average Daily Population ____
Housing Total this Date ____
Holding Total this Date ____

11. ***Facility Name*** ____
Address ____ Zip Code ____
Phone # ____ Fax # ____
Built ____ Renovated ____ Addition ____
Type ____ Number of Variances ____

Drill Time ____
Facility Capacity ____
Average Daily Population ____
Housing Total this Date ____
Holding Total this Date ____

RECEIVED
FEB 25 2019
Texas Commission on Jail Standards

EXHIBIT 9

TEXAS COMMISSION ON JAIL STANDARDS
JAIL INSPECTION REPORT

**Facility Name:** Bexar County Jail **Date:** February 19-22, 2019

| Item | Section | Paragraph | Comments |
|---|---|---|---|
| 1 | 267 | .1 | **The releasing officer shall determine inmate identity before discharge or release.**<br>The administration has employed and authorized civilian employees to perform releasing officer duties which is a violation of minimum jail standards. |
| 2 | 271 | .1(b)(3) | **A custody reassessment shall be conducted within 30 - 90 days of the Initial Custody Assessment and immediately upon any disciplinary action and/or change in legal status which would affect classification.**<br>**A documented classification review to determine the necessity for a complete reassessment shall be conducted every 30 - 90 days thereafter.**<br>Inmate classification paperwork and staff interviews indicated that jail staff routinely exceed custody reassessments as required. One file exceeded the 90 day limit by 27 days. |
| 3 | 273 | .4(a) | **The health services plan shall include procedures for the maintenance of a separate health record on each inmate. The record shall include a health screening procedure administered by health personnel or by a trained booking officer upon the admission of the inmate to the facility**<br>The administration has employed and authorized civilian employees to perform duties of health personnel or trained book in officers which is a violation of minimum jail standards. |
| 4 | 273 | .5(a)(1) | **(a) Each sheriff/operator shall develop and implement a mental disabilities/suicide prevention plan, in coordination with available medical and mental health officials, approved by the Commission by March 31, 1997. The plan shall address the following principles and procedures:**<br>**(1) Training. Provisions for staff training (including frequency and duration) on the procedures for recognition, supervision, documentation, and handling of inmates who are mentally disabled and/or potentially suicidal. Supplemental training should be provided to those staff members responsible for intake screening;**<br>The administration was unable to provide training records to confirm the that detention officers received suicide prevention training in accordance with the approved operational plans. |
| 5 | 273 | .5(a)(5) | **Supervision. Provisions for adequate supervision of inmates who are mentally disabled and/or potentially suicidal and procedures for documenting supervision. The approved Bexar Co. operational plan for inmates of full suicide precautions states that inmates shall be observed every 15 minutes.**<br>Observation logs indicated that jail staff exceeded the required face-to-face 15 minute observations on a continual basis in accordance with the jails own approved operational plan. |
| 6 | 275 | .1 | **Facilities shall have an established procedure for documented, face-to-face observation of all inmates by jailers no less than once every 60 minutes.**<br>Observation logs indicated that jail staff exceeded the required face-to-face 60 minute observations on a continual basis by as few as 1 minute up to 126 minutes. |

RECEIVED

FEB 25 2019

Texas Commission on Jail Standards

**EXHIBIT 9**

**TEXAS COMMISSION ON JAIL STANDARDS**
**JAIL INSPECTION REPORT**

7 275 .2 **Personnel employed or appointed as jailers of county jails or personnel appointed, employed, or assigned to directly supervise jailers shall be licensed as per the requirements of the Texas Commission on Law Enforcement under the provisions of Part 7 of this title. Personnel employed or appointed as jailers or personnel appointed, employed, or assigned to directly supervise jailers at facilities operated under vendor contract with a county or city shall be licensed as per the requirements of the Texas Commission on Law Enforcement under the provisions of Part 7 of this title.**

The administration has employed and authorized civilian employees to perform duties of licensed jailers. These civilian employees are not licensed as jailers by TCOLE as required.

8 275 .7 **Inmates shall be observed by a peace officer or a jailer licensed by the Texas Commission on Law Enforcement or bailiff when outside the security perimeter in court holding cells. The sheriff/operator shall have an established procedure for documented, face-to-face observation of all inmates no less than once every 30 minutes. One jailer, licensed peace officer, or bailiff shall be provided on each floor where 10 or more inmates are detained, with no less than one jailer, licensed peace officer, or bailiff per 48 inmates or increment thereof on each floor for direct inmate supervision. Where required, there shall be a two-way voice communication capability between inmates and jailers, licensed peace officers, or bailiffs at all times. Closed circuit television may be used, but not in lieu of the required personal observation.**

The administration has employed and authorized civilian employees to perform duties of licensed jailers, bailiff or peace officers in the security perimeter of the court holding cells. These civilian employees are not licensed as jailers by TCOLE as required.

9 285 .1 **Each facility shall have and implement a written plan, approved by the Commission, for inmate physical exercise and physical recreation. Documentation of physical exercise and physical recreation shall be maintained for Commission review. Each inmate shall be allowed one hour of supervised physical exercise or physical recreation at least three days per week.**

The inspection team was unable to verify, through maintained documentation, that recreation is being offered to inmates at least 3 days per week for 1 hours as required by minimum jail standards.

**Jennifer Shumake, TCJS Inspector**

**William Phariss, TCJS Inspector**

RECEIVED
FEB 25 2019
Texas Commission on Jail Standards

**EXHIBIT 9**

## TEXAS COMMISSION ON JAIL STANDARDS - INSPECTION REQUIREMENTS REVIEW

Jennifer Shumake, TCJS Inspector

William Pharlss, TCJS Inspector

**Facility Name:** Bexar County Jail **Date:** February 19-22, 2019

| Chapter | Title | Comments |
|---|---|---|
| 259 | New Construction | Conducted a walk through inspection of the facility. |
| 261 | Existing Construction | Not applicable. |
| 263 | Life Safety | Inspected life safety equipment and conducted and observed emergency drill. Reviewed documentation. Conducted staff interviews. |
| 265 | Admission | Reviewed a random sample of 50 inmate files. Interviewed staff. Reviewed policy. Technical assistance provided. During the walkthrough of the facility, the inspection team observed the area where inmate personal property is located. The personal property bagging has the property inventory and receipt attached to the outside. The inspection team observed numerous property inventory logs/receipt with blank areas for inmate signatures. The property inventory logs/receipts did not notate inmate refusals, nor provide notation of the refusal and signatures required by the receiving officer and witness. Follow-up action: The inspection team is requiring that a plan of action be submitted, within 30 days, to ensure that officers receiving property have the inmate sign the receipt or notate with the refusal in accordance with minimum standards. |
| 267 | Release | Reviewed a random sample of 10 inmate files. Interviewed staff. Deficiency noted-see report. Technical assistance provided. While conducting a walkthrough of the new south tower addition, the inspection team observed that the administration has civilian employees in the releasing area to process the release of inmates. The inspection team recommended that the administration immediately replace the unlicensed, civilian employees with trained, licensed officers as required by minimum jail standards. Follow-up action required. The administration will immediately email the inspection team names and PID numbers for all of the officers that take the place of the current civilian employees. |
| 269 | Records/Procedures | Reviewed policy and documentation. Interviewed staff and reviewed ADA compliance evaluation. |
| 271 | Classification | Reviewed a random selection of 50 inmate files. Reviewed staff training records. Reviewed internal classification audits. Reviewed policy. Interviewed staff. Reviewed internal classification audits. Reviewed policy. Interviewed staff. Technical assistance provided. 1) - During a review of the classification process, it was determined that the Bexar Co. Jail staff are utilizing the point additive system for classification. Points for offenses have been derived from a scale based off the FBI Uniform Crime Reporting (UCR) Program, not the current TCJS Severity of Offense Scale. Bexar County's system has been validated by the courts. However, jail staff are unable provide an entire classification instrument with an itemization of the points for each category. To ensure that assessments are being done in accordance with their plan, the inspection team is requiring that a hard copy with the point break down explanation be available for review during inspections and submitted for record to the Commission as part of their approved Classification Plan within 30 days. 2) Jail staff have a portion (gang offenders/renounced gang members) of the inmate population labeled as "special management" due to needing protection or requiring separation to protect the safety and security of the facility. Interviews with jail staff and inmates reveal that these inmates are not under disciplinary action and considered general population. These special management inmates are being allowed limited time in the dayroom up to 4 hours a day, with another tier of special management inmates being let out next while the rest are secured in their cell. The inspection team is requiring that a plan of action be submitted, within 30 days, to either ensure inmates labeled as general population receive all privileges or if necessary, a reason be denoted (for safety and security) why they are housed in administrative separation. |

RECEIVED
FEB 25 2019
Texas Commission on Jail Standards

EXHIBIT 9

## TEXAS COMMISSION ON JAIL STANDARDS - INSPECTION REQUIREMENTS REVIEW

| | | |
|---|---|---|
| 271 | Classification (cont.) | Deficiencies noted-see report. Technical assistance provided. 3) - A review of classification paperwork and staff interviews revealed that staff are not performing a reassessment within the required 30-90 time period. Staff review inmates utilizing an in-house form. Information from the review form is not entered in the reassessment instrument. Therefore, a new score, derived from risk factors in the approved reassessment instrument, to determine the new custody level is not produced. A review of 50 random inmate classification revealed reassessment up to 27 days over the required 30-90 time period. The inspection team is requiring that a plan of action be submitted, within 30 days, to ensure that classification reassessments are being performed in accordance with minimum standards. 4) A review of classification paperwork and staff interviews revealed that staff are not performing a reassessment immediately upon any disciplinary action and/or change in legal status. Sgt. Mitchell, Sgt. Garza, and Cpl. Bales all identified that disciplinary action and/or changes in legal status are only being addressed on the 30-90 reassessment and not immediately. The inspection team is requiring that a plan of action be submitted, within 30 days, to ensure reassessments are being performed in accordance with minimum standards and their approved operational plan (Commission approved 6/24/2016) on the 30-90 reassessments and upon disciplinary action and/or change in legal status. 5) Staff provided a classification audit report for the inspection team to review. The monthly audits are not specifically assessing whether inmates are classified prior to inmate housing, inmates are housed according to their assigned custody levels, and the override rate is acceptable, and/or if the instrument is being performed in a timely manner. The audit does assess if a classification instrument is completed accurately. The inspection team displayed the two classification audit logs available on the TCJS website to classification staff. Follow-up action - The inspection team is requiring that a plan of action be submitted, within 30 days, to ensure that classification audits are being performed in accordance with minimum standards and their approved operational plan. Recommendation - The inspection team recommends that all classification staff retake an objective jail classification course within 30 days and every two years thereafter. |
| 273 | Health Services | Reviewed a random selection of 50 files. Interviewed staff and inmates. Reviewed training records. Reviewed policy. Deficiency noted-see report. Technical assistance provided. 1. While conducting a walk-through of the new intake area of the south tower, the inspection team observed that the administration has employed civilian employees in the intake area to conduct the Screening Form for Suicide and Medical/Mental/Developmental Impairments. The inspection team recommended that the administration immediately replace the unlicensed civilian employees with health professionals or trained booking officers as required by minimum jail standards. Follow-up action required. The administration will immediately email the inspection team names and PID numbers for all of the officers that take the place of the current civilian employees. 2) Deficiency noted-see report. Technical Assistance Provided. While reviewing the operational plans, the inspection team observed and verified that the Mental Disabilities/Suicide Prevention Plan was last approved by the commission on May 22, 2015. The current plan states that all detention officers will receive one hour of suicide prevention training annually during in-service hours. While reviewing suicide prevention training documentation, the administration could not provide documentation of training of all of the detention staff. The inspection team recommended that the administration train all officers in accordance to the approved operational plan. The inspection team also recommended that the administration document and maintain all training rosters for Commission staff to review upon request. Follow-up action required. The administration will assess the current operational plan and implement a plan of action to ensure that all detention officers receive training in accordance with the approved operational plans within the next 30 days. The administration will email the inspection team roster training of all detention officers within the next 90 days. 4) Technical assistance provided. While reviewing the inmate restraint chair log, it was observed that the current form does not include all of jails standards requirements on the form. The inspection team recommended that the administration amend the current form to include all jail standards. Follow-up action required. The administration will email this inspector the new form within 30 days. |

RECEIVED

FEB 25 2013

Texas Commission on Jail Standards

EXHIBIT 9

TEXAS COMMISSION ON JAIL STANDARDS - INSPECTION REQUIREMENTS REVIEW

| | | |
|---|---|---|
| | Health Services (cont.) | 5) Deficiency noted-see report. Technical assistance provided. The inspection team reviewed a random selection of dates for observation logs. Per the Bexar Co. operational plan, persons who are under Full Suicide Precautions (FSP) are to observed no less than 15 minute intervals. Staff are using both an electronic timekeeping device and a handwritten log for documentation. There are times in which observations were logged on only one medium. However, there are multiple times in which the electronic timekeeping device and the handwritten logs conflict. A documented incident in housing unit AF on 9/1/2018 indicated an electronic record of observations being performed at 1:25 pm and again at 1:52 pm. The handwritten log has observation times recorded at 1:30 pm and 1:45 pm. Housing units do not have cameras for the inspection team to verify staff are physically performing observations in accordance with minimum standards. The inspection team is reqiring a plan of action be submitted, within 30 days, to ensure that observations are being performed within the required 15 minute observation as required by their approved operation plan. |
| 275 | Supervision | Reviewed a random selection of 200 jailer TCOLE certification records. Reviewed officer documentation. Interviewed staff. Deficiencies notes, Technical Assistance provided. 1) The inspection team reviewed a random selection of dates for observation logs. Staff are using both an electronic timekeeping device and a handwritten log for documentation. It was found that staff exceeded the required 60 minute face-to-face observations by 1 minute up to 126 minutes. From the handwritten logs, the inspection team observed that the consistency in exceeding the required observations was primarily due to staff responding to critical calls in the facility involving inmates. The inspection team is requiring a plan of action be submitted, within 30 days, to ensure that observations are being performed within the required 60 minute observation as required by minimum standards. |
| 275 | Supervision (cont.) | 2) Deficiency noted-see report. Technical Assistance Provided. While conducting the walk-through of the Courthouse Holding area and the new south tower addition of the main jail, the inspection team determined that the administration has employed civilian staff members to be utilized in positions within the secured perimeters of the jails that require a licensed jailer. If the administration wants to continue this practice, the civilian staff will be required to have least a temporary jailer license as mandated by the Texas Commission on Law Enforcement. The inspection team recommended that the civilian employees be removed immediately from the jailer positions and to replace the civilian employees with licensed jailers as required by The Texas Commission on Law Enforcement. Follow-up action required. The administration will immediately email the inspection team names and PID numbers for all of the officers that take the place of the current civilian employees. 3) Deficiency noted-see report. Technical Assistance Provided. While conducting a walk-through of the courthouse holding cells, the inspection team observed that the administration has employed civilian employees which were observed operating intercoms and in control of doors within the secured perimeter. The inspection team recommended that the civilian employees be removed immediately from the jailer positions and to replace the civilian employees with licensed jailers as required by The Texas Commission on Law Enforcement. Follow-up action required. The administration will immediately email the inspection team names and PID numbers for all of the officers that take the place of the current civilian employees. |
| 277 | Personal Hygiene | Conducted a facility walk through. Reviewed facility schedule. |
| 279 | Sanitation | Conducted a facility walk through. Interviewed staff and inmates. Reviewed policy. Technical assistance provided. While conducting the walk-through of the jails, the inspection team observed multiple cells with low water pressure and toilets to be out of order. There were also multiple obstructed air vents, dirty HVAC ventilation grates, dirty inmate shower areas, dirty inmate cells to include food on doors and windows and trash on the floors and in the corners, excessive empty bottles, books and supply in the inmate cells, missing detention grade screws on intercom face plates, Damaged Plexiglas, dirty food trays and sporks that were already washed, missing trash can lids, old rusted and corroded cooling pan racks, chipped floor paint and missing floor tiles, stained ceiling tiles, damaged ceiling tiles, and gnats in multiple areas of all of the jails. The inspection team recommended that the administration implement a plan of action to correct all of the sanitation issues. The plan of action should include begin dates and completion dates. Follow-up action required. The administration will email this inspector a long term plan of action within the next 60 days. A large number of the issues were addressed and corrected prior to concluding the inspection. |
| 281 | Food Service | Conducted walk through inspection in kitchen area. Interviewed staff. Reviewed documentation. |

RECEIVED FEB 25 [illegible] Texas Commission on Jail Standards

EXHIBIT 9

TEXAS COMMISSION ON JAIL STANDARDS - INSPECTION REQUIREMENTS REVIEW

| | | |
|---|---|---|
| 283.1 | Discipline | Reviewed 30 disciplinary hearing records. Interviewed staff and inmates. Reviewed policy. Reviewed inmate rules. |
| 283.3 | Grievance | Reviewed 30 inmate grievance/complaints. Reviewed policy. Interviewed staff and inmates. Technical assistance provided. While conducting a walk-through of the jails, the inspection team received multiple complaints regarding the grievance process and the response that inmates would receive or the kiosk system. The inspection team interviewed the grievance staff and it was determined that the grievance team was documenting a period "." as the 15 day interim response. The inspection team recommended that the staff implement a plan of action to ensure that inmates receive a valid 15 day interim response as required by minimum jail standards. No follow-up action required. Issue was addressed while the inspection team was on-site. |
| 285 | Exercise | Walk through of exercise area conducted. Reviewed documentation. Interviewed staff and inmates. Deficiency noted-see report. Technical assistance provided. Through inmate interviews, staff interviews and the review of inmate recreation logs, the inspection team was not able to verify that recreation is conducted as required by minimum jail standards. The inspection team recommended that the administration implement a plan of action to ensure that inmates are consistently provided recreation as required by minimum jail standards. The inspection team recommended that the administration implement a new uniform and consistent log for the all of the jails to utilize and maintain for Commission staff to review upon request. Follow-up action required. The administration will email the lead inspector a plan of action and new recreation log within the next 30 days. |
| 287 | Education/Library | Reviewed policy and schedule. Interviewed staff and inmates. |
| 289 | Work Assignments | Reviewed policy and schedule. Interviewed staff and inmates. |
| 291.1 | Telephone | Reviewed policy and schedule. Interviewed staff and inmates. |
| 291.2 | Correspondence | Reviewed policy and schedule. Interviewed staff and inmates. |
| 291.3 | Commissary | Reviewed policy and schedule. Interviewed staff and inmates. |
| 291.4 | Visitation | Reviewed policy and schedule. Interviewed staff and inmates. |
| 291.5 | Religious Practices | Reviewed policy and schedule. Interviewed staff and inmates. |
| xxx | Variances | Reviewed facility variances. |
| xxx | Remedial Orders | Not applicable. |
| xxx | Complaints | Not applicable. |
| xxx | CCQ | CCQ inquiries are being submitted through TLETS as required. |

RECEIVED
FEB 28 2019
Texas Commission on Jail Standards

RECEIVED
Texas Commission on Jail Standards





# Grandmother's death in Bexar County Jail is a travesty

Express-News Editorial Board December 21, 2018

RELATED TOPICS

San Antonio

AP's Member Network

San Antonio Express-News

Janice Dotson-Stephens was a mother and a grandmother. She was 61 years old and lived with mental illness — and she should never have died in jail, much less been there.

She found herself in the Bexar County Adult Detention Center after San Antonio police arrested her this summer and charged her with criminal trespass. It was a dubious charge, but for the next five months, she languished, slipping through bureaucratic cracks until she died on Dec. 14, likely of natural causes.

Five months in jail. For nothing warranting that.

Her bail was $300, sparking national outrage about the tragic and shameful unfairness of America's cash bail system — one that locks up people for being poor, and forces guilty pleas to secure release.

Bail reform has swept the nation, and this travesty is a chilling reminder of why change is overdue. But there is a deeper failure here. Despite obvious warning signs, the criminal justice system failed to promptly notice and treat Dotson-Stephens' mental illness.

From arrest to death, the system failed at critical moments. Police officers didn't see her mental health issues. Neither did judges or pretrial services workers, even though she repeatedly refused interviews and personal recognizance bonds, meaning she would have been free without any cash bail.

No one knows if her court-appointed attorney ever visited her — a damning gap in the system. Her family had no idea where she was. They have said they checked the jail and treatment providers to no avail and worried she was on the streets.

And when a psychiatric evaluation was finally conducted after she had spent months in jail — it somehow was lost. Bexar County Sheriff Javier Salazar said case notes show she was found incompetent. If so, she would have received mental health treatment. Instead, she died in the jail's infirmary.

"A lot of incompetence. A lot of breakdowns," Bexar County Judge Nelson Wolff told us. "She never should have been there."

The story begins on July 17 on the East Side at Mount Zion Sheltering Arms, an affordable housing complex for the elderly and disabled.

Dotson-Stephens was not a resident, but her husband, Reginald Stephens, is a resident. Michelle Dotson, one of their children, said her mother kept her own apartment. But when symptoms from paranoid schizophrenia and manic depression would flare up, she found her way to Reginald Stephens' apartment.

"She seeks his support and his comfort, so she was actually staying with him, temporarily" she said.

There was a disturbance. San Antonio Police were called and they found Dotson-Stephens upset and agitated. She refused to provide her name and insisted she lived at the property, the police report says. It does not mention interviewing Reginald Stephens.

"She was screaming and hollering," Mary Lou Kasberg, the complex manager, told us. "She said, 'Take me to jail.' And that's what they did."

This is where the system first failed her.

The officers did not have to take her to jail. They could have taken her to a mental health care provider.



"There are so many people (who) are going into the jail that should be diverted the civil commitment route," said John Bull, presiding judge of the city's municipal court, who was not involved in this case.

The next failure came at magistration.

One of the reasons we have editorialized about representation at bail hearings is to ensure defendants understand what is happening to them. Defendants such as Dotson-Stephens. Having an attorney at this critical moment might have brought awareness of her mental health issues. She deserved an advocate.

Even so, with or without representation, the magistrate could have released her. Or the magistrate could have ordered a civil commitment, and subsequent evaluation. She was arrested before, and the family has said she had been referred to treatment. If that happened — and the family would know if it had — that case history should have been available.

Instead, Dotson-Stephens was slapped with a $300 bond and sent to jail. It's been said jail costs $50 a day, so taxpayers spent $7,500 to keep her locked up. Why?

Again and again, day after day, Dotson-Stephens refused to be seen by pretrial services. She refused personal recognizance bonds. She refused to be interviewed for a court-appointed attorney. July turned to August.

These were warning signs. Bright, flashing warning signs that something was not right.

In an email, Jim Bethke, the former head of the Texas Indigent Defense Commission, who now oversees the Lubbock Private Defender Office, said "a competency evaluation can be done at any point, and expedited."

This is because it's not possible to force medication on someone, outside of extreme circumstances, unless that person is found to be incompetent.

He also said "at any point in the detention period" medical staff could evaluate a person and transfer him or her to a county or state hospital for treatment.

There is also a question about representation. According to a county timeline, Dotson-Stephens was appointed an attorney, Jerry Valdez, on Aug. 8. Did Valdez ever visit her?

He did not respond to our email and phone messages, but Salazar, Bexar's sheriff, told us there is no record of visitation. Wolff, the Bexar County judge, said, "I have no idea what the hell he did."

If he didn't visit, another missed opportunity.

Dotson-Stephens stayed in the jail's infirmary due to mental health concerns and underlying physical health issues, Salazar said. Months passed. A psychiatric evaluation was ordered in late August by Magistrate Andrew Carruthers. It was completed on Oct. 2 by University Health System, according to the county. But it's unclear what happened next. Health officials have said it was sent. County officials have said the judge has said it was not received.

How could someone spend so long in jail, on nominal bond, for such a minor offense? How could Dotson-Stephen's plight go unnoticed until she eventually died?

Salazar was at a loss.

"The way the system is set up, I don't have the power to just let people go if I don't agree with the reason they were here," he told us.

But his staff could monitor the jail population and keep track of how long people are there and for what charges.

Salazar told us he is now asking staff to "give me a list of all the people who are here on misdemeanors."

EXHIBIT 10

These would be defendants such as Dotson-Stephens. People charged with nonviolent offenses and locked up with low bonds. Shouldn't that have been happening all along? Salazar said the county's antiquated system makes such a task difficult.

The family has filed a federal civil rights lawsuit against the county, University Health System and pretrial services.

"Right now we just want answers. My mother was mentally ill and mental illness is very complex," Michelle Dotson said. "Outside of her mental illness, she was a good mother."

Throughout this year, we have written about inherent inequalities in the criminal justice system. Dotson-Stephens' incarceration and death magnifies all of the system's failures. Cash bail for nominal offenses. No oversight of court-appointed attorneys. A failure to quickly recognize mental health issues.

She wasn't just an inmate. She was a mother of four children. She had 10 grandchildren. Five months in jail for an offense that didn't warrant that.

It's appalling.

Fix this broken system.

This editorial is part of the Unequal Justice series, which explores the inequities in Bexar County's criminal justice system and how they can be fixed.



# Secrecy keeps Bexar County's bail system humming

By Josh Brodesky

Published 12:00 am CDT, Saturday, September 15, 2018



Photo: Associated Press File Photo

Bryan Sweeney spent three days in Harris County Jail in 2016 because he did not have $10,000 bail for two misdemeanor charges. Footage from Harris County bail hearings shows indifference. There are no videos of hearings here.

One by one, the defendants rise. A magistrate judge outlines charges for each defendant, asks if they are citizens and sets a nominal bail, maybe $500 or $1,500, before sending them off to jail.

The hearings last maybe 15 seconds. They would be dull — like waiting for your number to be called at the DMV —if they weren't so brutally efficient. They would be benign, if liberty didn't come at a price.

There is no discussion with Magistrate Judge Hal Turley about a defendant's finances, mental health, employment or risk to the public. There is no defense attorney. There are only defendants. Mostly minority. **And there is bail and then jail.**

The images out of Dallas are similar to bail hearing footage, released in 2016, from Harris County. Indifference reigns in those videos, too, and so does meanness.



Magistrate judges in Harris County berated defendants. One raised a defendant's bail because she answered a question with a "yeah."

"I don't expect anything other than a yes or a no," he said, doubling her bail to $2,000. And in Bexar County**? We have no idea. Bail hearings here hum along in secrecy.** "It's unconstitutional for these bail hearings to be closed to the public," said Alec Karakatsanis, executive director of Civil Rights Corps, which has sued Harris and Dallas counties over their bail practices.

"The reason the First Amendment requires courts to be open is that when things happen in the dark, it's a recipe for corruption and indifference."

Maybe that's not happening here, but we can't say with certainty. There is no public access, and there is no video of these hearings. Michael Ugarte, Bexar's presiding magistrate, never responded to email and phone messages.

**Bail hearings, especially for misdemeanors, are small moments in small cases, but they are a big deal because they often have outsized ramifications for poor defendants.**

**"The ability to secure bail often makes the difference between guilt and innocence, retaining employment and family obligations, and keeping a place to live,"** Shima Baradaran Baughman, a law professor at the University of Utah S.J. Quinney College of Law, writes in a recent piece about the history of misdemeanor bail.

A defendant who can afford an attorney can often afford bail. And that attorney, if notified early enough, can ask a judge for a bond reduction.

"I was a magistrate judge," said Joe Gonzales, a Democrat now running for district attorney. "I did that for seven years, and sometimes a defense lawyer would call and request a bond reduction."

But a poor defendant is never so fortunate, although that is about to change. Soon, the Bexar County Public Defender's Office will be present at bail hearings for indigent defendants.

"It's absolutely essential to even a chance of a fair hearing," Karakatsanis said. Progress, yes, but still not enough because, again, the hearings are closed.

EXHIBIT 11

"We and others will certainly take a look at Bexar County and think about whether it makes sense to get involved and, if so, how," Karakatsanis wrote in an email. "Hopefully they will just agree to implement reforms that we can get made in Harris County and Dallas."

There is an order of magnitude here to consider. Nearly 40,000 indigent cases passed through Bexar County courts in fiscal year 2017, according to state data. More than half of these cases were misdemeanors. Marijuana possession. Resisting arrest. Theft. Criminal trespass. Annoyances and potential crimes that merit potential punishment, but not necessarily reasons for people to sit in jail or lose their jobs, much less their right to a presumption of innocence.

Now, Bexar County has instituted some reforms, partly out of concern about getting swept up in this wave of bail lawsuits. The 48-hour bond review hearings at jail court — where Bexar County deputies once asked me to leave while simply observing court — is a good policy created to avoid a possible lawsuit over jailing poor people.

The temptation might be to say, enough is enough, and let the wheels of justice clunk along.

But if representation at bail hearings is essential to any shot at fairness, then so is ensuring public access to a court where decisions about jail and bail have been cloaked in secrecy.

*jbrodesky@express-news.net*




EXHIBIT 12

**SAN ANTONIO POLICE DEPARTMENT**
**GENERAL MANUAL**

***Procedure 611 – Mentally Ill Persons***

| Office with Primary Responsibility: | CSB | Effective Date: Prior Revision Date: | December 18, 2017 December 16, 2016 |
|---|---|---|---|
| Office(s) with Secondary Responsibilities: | CTA | Number of Pages: | 10 |
| Forms Referenced in Procedure: | SAPD Form #127-ED | Related Procedures: | 502, 802 |

## .01 *INTRODUCTION*

Officers may encounter persons who exhibit symptoms of mental illness in a variety of community settings. This procedure is intended to assist officers in the evaluation, assessment, and disposition of persons (both adults & juveniles) with mental illness who are involved in a mental health crisis.

## .02 *DISCUSSION*

A. Police officers must understand persons with mental illness have an illness requiring professional assistance and the officers' actions may affect the immediate behavior of a person with mental illness.

B. Officers should attempt to carefully evaluate individuals involved in a mental health crisis and determine the best course of action to take in order to resolve the situation according to the guidelines established in this procedure and GM Procedure 802, *Unusual Occurrences and Critical Incidents*.

C. The Department has implemented a program which provides officers the opportunity to receive specialized training in handling mental health crises. Officers who complete this training become certified as Crisis Intervention Team (CIT Officers). CIT Officers are trained in using crisis intervention techniques and skills to handle incidents involving persons with mental illness.

## .03 *TERMINOLOGY* (For specific use within this procedure, see Glossary)

Credible Person | Crisis Care Center | Critical Incident | Local Mental Health Authority

Mental Health Crisis | Mental Health Facility | Mentally Ill Person

Notification of Emergency Detention | Order of Protective Custody | Persons with Mental Illness

Warrantless Emergency Detention

## .04 *RECOGNITION OF MENTAL ILLNESS*

A. Police officers routinely encounter situations involving persons exhibiting unusual behavioral characteristics, ranging from passive to violent. Police officers must recognize symptoms which may indicate the existence of mental illness.

B. The following are some of the symptoms commonly associated with persons with mental illness:

1. Drastic mood swings or behavioral changes;
2. Loss of memory;
3. Thoughts of being plotted against or delusions of grandeur;
4. Speaks to himself, hears voices, sees visions, or smells strange odors;
5. Thinks people are watching or talking to him;





EXHIBIT 12

6. Exhibits an extreme degree of panic or fright;

7. Behaves in a way dangerous to himself or others (i.e., hostile, suicidal, makes threats towards others, etc.);

8. Poor personal hygiene or appearance; or

9. Demonstrates an unusual thought process or verbal expressions or is catatonic.

C. Upon recognition of a mental health crisis situation the officer's responsibilities include:

1. Maintaining a high degree of caution in dealing with the potentially unpredictable nature of persons with mental illness;

2. Protecting the general public from the actions of the persons with mental illness;

3. Protecting the persons with mental illness from his/her own actions; and

4. Providing the most effective remedy available at the time to resolve the crisis situation.

**.05 *CRISIS INTERVENTION TEAM (CIT) OFFICERS***

A. A Crisis Intervention Team (CIT) officer is defined as any officer on the Department who has successfully completed the 40 hours Crisis Intervention Team training.

B. CIT Officers are assigned to regular patrol duties and when available respond to situations involving persons who are experiencing a mental health crisis.

C. The CIT Officer at the scene of a call involving a mental health crisis situation has the responsibility for handling the situation unless otherwise directed by a supervisor. The CIT Officer should ask for additional support, if necessary.

D. CIT Officers may only take the same courses of action as other patrol officers when handling a mental health crisis. The courses of action are listed in Section .08 of this procedure.

**.06 *INITIAL RESPONSE***

A. Communications Unit - Dispatchers responsibilities include:

1. Attempt to determine if a service call is a mental health crisis;

2. Identify mental health crisis calls by using appropriate code; (Mental Health in Progress, Mental Health Disturbance, Mental Health Routine);

3. Assign and dispatch a CIT Officer when available, along with a cover officer, to mental health crisis situations;

4. Assign and dispatch an officer and at least one cover officer to mental health crisis situations when a CIT Officer is not available; and

B. Officers responsibilities include:

1. When dispatched, the officer assigned report responsibility coordinates his arrival with the cover officer;

2. If the handling officer assigned to a call is not a CIT Officer, he may request a CIT Officer respond to assist with the call;

EXHIBIT 12

3. When officers handling a call become aware it involves a mental health crisis, the handling officer may request a CIT Officer from the dispatcher. If a CIT Officer is available within the assigned service area, the dispatcher should dispatch the CIT Officer to the scene; and

4. Upon arrival and assessment of the call, officers may request a Mental Health officer, through their dispatcher, to assist with the call. Mental Health officers may be requested for situations as outlined in Section .10 subsection F of this procedure;

5. Immediately notify a supervisor when confronted with situations which pose a potential for serious bodily injury to any person, including situations which have a potential to escalate to a critical incident.

**.07 *ARRIVAL AT THE SCENE***

A. Circumstances permitting, the officer takes time to effectively evaluate the situation prior to taking any action. Officers should determine the best course of action to be taken, including the need for Emergency Medical Services (EMS) or Warrantless Emergency Detention.

B. Officers should be prepared to take the appropriate tactical measures to protect themselves and others. Officers should remain aware of the location of their cover officer, along with others involved in the situation.

C. Upon arrival at the scene, officers shall approach persons with mental illness with caution. Officers should keep these persons under close observation and speak to them in an unhurried, patient and calm manner, which is maintained throughout the incident.

D. A frisk of the individual and a search of the immediate surrounding area are conducted, in accordance with GM Procedure 502, *Warrantless Arrests, Searches, and Seizures*, to ensure the absence of any potential weapons. Frisking and handcuffing the individual may be necessary to satisfy safety requirements.

E. The person with mental illness should be guided to a safe and quiet area, if possible. This area should be away from other persons or things that may further incite the situation.

F. Officers shall not force individuals to take any medications. If the individual is taken into custody, any medication being taken by the individual should be transported with the individual and released to the appropriate medical or detention personnel (this shall be documented in the report).

G. Officers attempting to resolve a mental health crisis should rely on:

1. Close and constant visual observation of the person experiencing a mental health crisis situation;

2. Interviews of the person experiencing a mental health crisis situation. If possible, officers should interview relatives, friends, neighbors, or others associated with the situation;

3. Information provided by medical and mental health professionals regarding the physical and mental health condition of the person experiencing a mental health crisis situation;

4. Other available information sources and personnel, such as The Crisis Care Center, a CIT Officer, a field supervisor and other officers or data files; and

5. Personal experience, training, and sound judgment.

**.08 *COURSES OF ACTION***

A. In evaluating the person with mental illness and the crisis situation, all officers may take one of the following courses of action to resolve the situation:

1. Contact the Mental Health Detail during their working hours, Monday through Friday through the dispatcher.

2. Contact the Mobile Crisis Outreach Team through the Crisis Line at (210) 223-7233.

3. Complete a Warrantless Emergency Detention of the adult or child:

   a. If the patient has no medical issues and is medically stable, contact MEDCOM (24/7) at 210-233-5933 for navigation to the appropriate psychiatric facility:

      (1) Provide patient name and DOB

      (2) Provide location

      (3) Notify MEDCOM if the patient is pregnant

   b. Call EMS for an evaluation if:

      (1) Officer believes patient needs medical assessment.

      (2) Patient complains of medical illness.

      (3) Patient requests a medical evaluation.

      (4) If patient is cleared by EMS and needs to be Emergency Detained, the officer will obtain the EMS badge numbers for their report. The officer will then contact MEDCOM for navigation to the appropriate psychiatric facility as in 3. (a).

   c. Call EMS and additional manpower for emergent response if.

      (1) Excited Delirium, severe agitation or violent behavior

      (2) Mental status changes or confusion (change from baseline)

      (3) Recent trauma or overdose

      (4) If EMS is going to transport, and the patient still needs to be Emergency Detained, the officer will follow EMS to the hospital where a Notification of Emergency Detention will be written.

4. Arrest and book the person according to procedures if the person has committed a criminal offense and the officer has a legal authority to arrest; or

   a. With a supervisor's approval, conduct a Warrantless Emergency Detention in lieu of arrest if the person with mental illness has committed a misdemeanor criminal offense other than DWI and Family Violence. Family Violence includes Assault Bodily Injury Married/Cohabitation, Family/Household, Terroristic Threat-Family, Deadly Conduct-Family, Unlawful Restraint, Interfering with an Emergency Phone Call, Harassment, and Telephone Harassment. The officer will "SP" the person with mental illness on the correct report and notify the victim that he can pursue charges through the appropriate follow-up unit.

   b. **IF** after an arrest, an officer is ordered by a Magistrate to conduct a Magistrate's Order for Emergency Apprehension and Detention in lieu of the arrest, the officer will "SP" the person with mental illness on the correct report. If the officer receiving the Order from the Magistrate is not the original handling officer, the second officer will write a supplemental report with the original case number and detail the non arrest, the Magistrate's Order and the disposition of the "SP" and forwards the supplement to the follow-up unit. If



this is the situation, the second officer will not write a Notification of Emergency Detention (SAPD Form #127-ED). The Magistrate's Order takes the place of the application.

c. If any person sustained any injury during the arrest or if any use of force requiring a use of force report was necessary, the person with mental illness will be arrested. A supervisor may approve the Warrantless Emergency Detention if he/she determines this is the better course of action due to the person's mental state and need for psychiatric evaluation/treatment.

d. Under this procedure, a person's intent to cause property damage only, is not considered a violent criminal offense if the person who committed the offense has a mental illness.

e. If rejected by the Crisis Care Center, the officer should take the person to the nearest appropriate inpatient Mental Health Facility or nearest emergency room.

f. In family violence cases resulting in no injury or minor injury and where no further violence by the person with mental illness is anticipated, a supervisor should be contacted for final disposition.

g. Officers clearly document their actions along with any statements made by the reporting person and/or person with mental illness in the appropriate report.

5. Make a referral for further mental health care as outlined in Section .08, Subsection F, when the criteria for Warrantless Emergency Detention or arrest does not exist; or

6. Notify a supervisor and refer to GM Procedure 802, *Unusual Occurrences and Critical Incidents*, when confronted with critical incident situations.

B. Warrantless Emergency Detention-Officers Authority and Criteria

1. Officers making a Warrantless Emergency Detention will do so under the guidelines and authority as set forth in the Texas Health and Safety Code, Title 7, Mental Health and Mental Retardation, Subtitle C, Texas Mental Health Code, Chapter 573, Emergency Detention, Subchapter A, Apprehension by Peace Officer, and Section 573.001, Apprehension by Peace Officer without warrant. Detentions of this nature are for protective purposes and are not criminal.

2. A peace officer has the authority to take a person into custody without a warrant for the purpose of obtaining an evaluation of his emotional and mental status, and the need for involuntary hospitalization if the officer has reason to believe and does believe:

a. The person evidences mental illness; and

b. The person evidences a substantial risk of serious harm to the person or to others unless the person is immediately restrained; and

c. The officer believes there is not sufficient time to obtain a warrant before taking the person into custody.

3. A substantial risk of serious harm to the person or others may be demonstrated by:

a. The person's behavior; or

b. Evidence of severe emotional distress and deterioration in the person's mental condition to the extent the person cannot remain at liberty.

4. The peace officer may form the belief the person meets the criteria for apprehension based on specific recent behavior, overt acts, attempts, or threats by the person which are:

EXHIBIT 12

a. Evidence of severe emotional distress and deterioration in the person's mental condition to the extent the person cannot remain at liberty.

b. Observed by the officer at the time the apprehended person is found; or

c. Reliably reported to the officer by a credible person (Health & Safety Code Section 573.001).

C. Warrantless Emergency Detention-Custody of Persons with Mental Illness

1. When the authority and criteria required for Warrantless Emergency Detention are satisfied, a peace officer may apprehend a person with mental illness from a private residence or a public place.

2. If a person is voluntarily at a Hospital, clinic, nursing home, physician's office or minor emergency clinic, the officer should consider completing a Notification of Emergency Detention (SAPD Form #127-ED) if requested by the facility.

3. If the person with mental illness is accepted at a medical or psychiatric facility, that facility will provide any future transportation to a secondary facility.

4. When completing the Notification of Emergency Detention (SAPD Form #127-ED) at a hospital or psychiatric hospital, officers will:

   a. Evaluate the conduct of person with mental illness and the circumstances under which the person was found and taken into custody by the facility;

   b. List the physician's name, or name of other medical personnel, as the observer and credible person on SAPD Form #127-ED, *Notification of Emergency Detention,* in cases where persons with mental illness are sedated and no substantial risk of harm is observed by the officer. The officer should quote the physician or other medical personnel on all actions observed by them which confirms the person has a mental illness and is a risk to himself or others; and

   c. Leave a duplicate copy with an original signature of SAPD Form #127-ED and a copy of the offense report, with the facility staff and retain the original for routing to the Records Office.

5. If an officer is unsure whether the person's condition is primarily the result of a mental illness, physical illness, or a substance abuse problem, the officer will call or ask the Information Channel to call the Crisis Care Center and consult with the staff for guidance.

D. Warrantless Emergency Detention-Disposition of Persons with Mental Illness

1. Persons apprehended for Warrantless Emergency Detention must meet certain criteria before being admitted to the Crisis Care Center. Please refer to SAPDWEB (Public Intoxication and Emergency Detention Criteria) for the most current list of criteria. Please call the Crisis Care Center prior to transport at (210) 358-6902.

2. Persons taken to or who have already been accepted at the Crisis Care Center and become violent, assaultive, or in need of restraints; if requested by the Center, are transported to an appropriate medical facility at the direction of the Crisis Care Center or the nearest emergency room.

3. When a person fitting the criteria for Warrantless Emergency Detention is violent, assaultive, or in need of restraints, the officer transports the person with mental illness to the nearest hospital.

4. If the person suspected of having a mental illness suffers a medical emergency at the scene (other than the mental illness), the officer requests assistance from Emergency Medical Service (EMS) to transport the person to the nearest medical facility based on their protocols.

5. Regardless of which facility or hospital the person is taken to, the officer conducting a Warrantless Emergency Detention will complete SAPD Form #127-ED and an offense report.



6. A Warrantless Emergency Detention is civil in nature and does not impose criminal sanctions. However, officers should use sound tactics when contacting a person with a mental illness as hazardous situations may arise. When taking a person with mental illness into custody for Warrantless Emergency Detention, officers:

   a. May handcuff persons with mental illness before transporting;

   b. Shall search the person with mental illness before transporting;

   c. Retain custody of the person with mental illness until the facility accepts the person;

   d. Shall contact a supervisor and request relief when the officer expects to work beyond their assigned duty hours. Contact with the supervisor to request relief shall occur no later than thirty (30) minutes before the end of the officers assigned duty hours;

   e. Shall immediately orally inform the person being detained of the reason for the detention and that a staff member of the facility will inform him of his rights within 24 hrs of admission. Also, documentation of these actions will be made in the report; and

   f. Shall complete all required reports, including SAPD Form #127-ED, *Notification of Emergency Detention*, prior to releasing the person to a relief officer.

E. Booking Process

1. Persons with mental illness experiencing a mental health crisis who have committed a criminal offense are placed under arrest and booked into jail if the officer has a legal authority to arrest. With a supervisor's approval, a Warrantless Emergency Detention may be made in lieu of arrest in conformance with Section .08, Subsection A 4.

2. The officer, for safety reasons, immediately notifies Central Magistration personnel, including the nurse and mental health screener if available of suspected mental illness and/or suicidal tendencies involved with the prisoner.

3. The officer also makes the following notation on the magistrate's intake slip and the booking slip "Evidences Symptoms of Mental Illness."

4. Medication being taken by prisoners will be transported by the arresting officer and left with Detention Center personnel.

F. Referral for Additional Mental Health Care

1. Persons who do not fit the criteria for Warrantless Emergency Detention and who are not going to be booked for a criminal offense, but who do exhibit mental illness, are referred to an appropriate source for treatment. The officer may recommend the person see their doctor, counselor, therapist, or call the Crisis Line at (210) 223-7233.

2. Family members or persons concerned over the mental or emotional health of an individual can be referred to the Mental Health Office at the Bexar County Courthouse or may call the Crisis Line at (210) 223-7233. At the courthouse, family members may be required to complete the application for Emergency Apprehension and Detention and an application for Court-Ordered Mental Health Services with a request for an Order of Protective Custody. All applications shall be reviewed and acted upon by an appropriate judge or magistrate.

G. Persons with Mental Illness Involved in Critical Incidents





EXHIBIT 12

SAN ANTONIO POLICE DEPARTMENT
GENERAL MANUAL

*Procedure 611 – Mentally Ill Persons*

1. Critical incidents shall be handled in accordance with GM Procedure 802, *Unusual Occurrences and Critical Incidents*.

2. Officers confronted with situations that pose a continuing threat of serious bodily injury to any person will request additional officers and a supervisor through the dispatcher.

H. Threats Made by Persons with Mental Illness

1. Officers confronted with persons with mental illness who are making threats to harm themselves or others will assess the persons and determine if the criteria exist for a Warrantless Emergency Detention.

2. Officers will immediately make a reasonable effort to contact and notify the person who is the subject of the threats which are being made by the person with mental illness. Officers will document their notification or attempted notification to the person who is the subject of the threats in their report. Notification to persons who are the subject of threats will be made as follows:

a. Officers will call the person who is being threatened by telephone, and will advise them of the threats. Officers may leave a voice message advising the person of the threat and the SAPD case number.

b. If no telephone number is known for the person being threatened, officers will contact the person at their residence. If the residence is located within the boundaries of the officer's service area, the officer will go to the residence and make the notification in person. If the residence is located in another service area, the officer may follow-up with the supervisor's permission or he will notify the appropriate dispatcher to have an officer dispatched to make the notification. If no one is found at the residence, officers will leave a written notice of the threat and the SAPD case number.

c. If no telephone number or residence is known for the person who is being threatened, officers will notify and route a copy of the report to the Homicide Unit and the Crisis Response Team (CRT) at their substation prior to checking back into service. Crisis Response Team personnel will immediately follow-up on the threats by making a reasonable effort to notify the person who is the subject of the threats.

3. Officers will route a copy of all reports involving threats made by persons with mental illness to the Homicide Unit, Crisis Negotiators Detail, Crisis Intervention Team, and the Crisis Response Team at their service area substation. When threats are made against public officials or other high profile individuals, officers will also route a copy of their report to the San Antonio Regional Intelligence Center (SARIC). The report will include details of the threat and whether the person who is the subject of the threats was notified.

**.09 *REPORT RESPONSIBILITIES***

A. The officer assigned to the call by the dispatcher will have report responsibility for the mental health crisis situation, including the transporting of the person to an evaluation facility or detention facility.

B. Officers assigned report responsibilities will document their findings and any actions taken in their respective report. Copies of any report involving mental health issues shall be forwarded to the Mental Health Detail.

C. Officers handling a mental health crisis where the person with mental illness has not committed a criminal offense, but where the person is taken into custody for a Warrantless Emergency Detention, will complete an Offense Report along with SAPD Form #127-ED. No complainant will be listed on the report. The person with mental illness will be listed as the "Emergency Detention" (ED) on the report. The Offense Report will be titled as "Emergency Detention." Officers will list the situation found as "Mental Health Related" on all Emergency Detention offense reports and any report indicating the primary reason for the call was due to a mental health issue.

D. Officers handling a mental health crisis where the person with mental illness has not committed a criminal offense and where no Warrantless Emergency Detention is made will complete an Incident Report. Additionally, officers will complete the appropriate report criteria documenting the mental health crisis.

EXHIBIT 12

E. Officers handling a mental health crisis where a person with mental illness has committed a criminal offense will complete an Offense Report as follows:

1. The offense report will be titled with the appropriate criminal offense if an arrest is made and shall include the details of the criminal offense and any details needed to establish the criteria for Warrantless Emergency Detention if applicable. The complainant of the criminal offense will be listed as the "Victim" (V). If the person with mental illness is arrested for the criminal offense, the person will be listed as the "Arrested Person" (AP) on the Offense Report.

2. If no arrest and no Warrantless Emergency Detention are made, the person will be listed as the "Suspect" (SP). Additionally, officers will complete the appropriate report criteria documenting the mental health crisis; and

3. If the person with mental illness is not arrested for the criminal offense and a Warrantless Emergency Detention is made, the primary offense will be titled Emergency Detention, the person will be listed as the "Emergency Detention" (ED) on the Offense Report. The related offense will be titled as the criminal offense with the person also titled as the "Suspect" (SP). Additionally, officers will complete the appropriate report criteria documenting the mental health crisis and shall list in the details of the report that the ED was not arrested.

F. Officers who make a Warrantless Emergency Detention will complete SAPD Form #127-ED and include the case number at the top of the form. The original application will be forwarded to the Records Office. A duplicate with an original signature will be given to the facility accepting the person with mental illness along with a copy of the offense report.

G. Officers will forward copies of all reports involving mental health crisis situations, including a copy of SAPD Form #127-ED, to the Psychological Services Office and the Crisis Negotiators Detail when the officer reasonably believes the person with mental illness has the potential to become involved in critical incident.

**10. *N-CODING A MENTAL HEALTH RELATED CALL***

A. Officers responding to mental health calls will have three N-Codes available to use as the disposition of the Call for Service, if a report is not required to be written. They are as follows:

1. **N23MH – Mental Health No Complainant** – This N-Code is used when officers are dispatched to a location for someone who may be having a mental health issue and upon arrival they do not find anyone.

2. **N23MHN – Mental Health No Criteria for Emergency Detention** – This N-Code is used when Officers arrive at the call and after talking to the consumer, it is determined the consumer has mental health issues but the consumer is not homicidal, suicidal, or in a state of mental decompensation. The consumer and family if present, is given resources they can use.

3. **N23MHR – Mental Health – Refused Services –** This N-Code is used when Officers arrive at the call and after talking to the consumer, it is determined the consumer has mental health issues but the consumer is not homicidal, suicidal, or in a state of mental decompensation. The consumer also REFUSES any assistance and does not want any information on resources available to them.

**11. *MENTAL HEALTH DETAIL RESPONSIBILITIES***

A. Coordinate the training of Crisis Intervention Team officers;

B. Ensure a Department Psychologist is included in CIT training;

C. Maintain statistical data and complete an annual report on all reported mental health crisis calls; and

D. Maintain entry of CIT Officers into the computer PAPX System for identification of CIT Officers on the work sheet.

EXHIBIT 12

**12. *INITIAL AND REFRESHER TRAINING***

A. Police Cadets shall receive a minimum of 40 hours of Crisis Intervention Team Training regarding interactions with persons suspected of suffering from mental illness in the Training Academy.

B. Officers shall receive refresher training regarding interactions with persons suspected of suffering from mental illness at least every three years.

C. Newly hired civilian employees who will have contact with the public shall receive initial training interactions with persons suspected of suffering from mental illness from their parent unit.

D. Civilian employees who have contact with the public shall receive refresher training regarding interactions with persons suspected of suffering from mental illness at least every three years.

EXHIBIT 13

D. KIMBERLEY MOLINA, M.D.
Deputy Chief Medical Examiner

JENNIFER J. RULON, M.D.
Deputy Medical Examiner

JAMES A. FEIG, M.D.
Deputy Medical Examiner

RAJESH P. KANNAN, M.D.
Deputy Medical Examiner

WILLIAM D. MCCLAIN, M.D
Deputy Medical Examiner

SAMANTHA R. EVANS, M.D.
Deputy Medical Examiner

# BEXAR COUNTY MEDICAL EXAMINER'S OFFICE

RANDALL E. FROST, M.D., CHIEF MEDICAL EXAMINER
7337 LOUIS PASTEUR
SAN ANTONIO, TEXAS 78229-4565
(210) 335-4000 FAX (210) 335-4002

***"Accredited by the National Association of Medical Examiners"***

---

## *AUTOPSY REPORT*

**Case No.** 2018-2984

**Name:** Janice Dotson-Stephens **Age:** 61 **Race:** B **Sex:** F

**Date & Time of Autopsy:** 15 Dec 2018 @ 8:00 a.m.

### EXTERNAL EXAMINATION

The body is that of a 68 inch, 154 pound, normally developed, well-nourished, adult female, whose appearance is consistent with the listed age of 61 years. The decedent is received dressed in a blue scrub top, beige panties and blue scrub pants.

Rigor mortis is fully developed in the jaw and extremities. Faint dorsal lividity is not fixed.

The black, curly scalp hair averages 3½ inches in length. The conjunctivae are unremarkable and without petechiae; the corneae are clear; and the irides are brown. The facial bones are intact to palpation. The teeth are natural and in poor condition.

The neck, chest and abdomen are normally formed and atraumatic. The breasts are free of palpable masses. A 15 cm vertical scar extends down the upper ventral midline of the abdomen.

The back is straight and atraumatic. The anus is patent and atraumatic.

The upper and lower extremities are normally formed, symmetric and free of acute injury. The fingernails are variable in length but appear intact. Both lower legs and feet display moderate symmetrical edema and dry scaly change of the skin, consistent with vascular stasis changes. Incisions are made over the bony prominences of the wrists and ankles and demonstrate no evidence of significant trauma or hemorrhage.

The external genitalia are those of an adult female and are atraumatic.



**EVIDENCE OF MEDICAL INTERVENTION**

Multiple EKG lead pads are on the body. Defibrillator pads overlie the right upper, mid anterior and left lateral chest.

**INTERNAL EXAMINATION**

HEAD: The scalp is reflected and the cranial vault is opened. No fractures are seen. The dura is tough, white and pliable. There is no evidence of epidural, subdural or subarachnoid hemorrhage. The 1,290 g brain has glistening leptomeninges and appears normally formed. The parenchyma is soft with no evidence of intraparenchymal hemorrhage, infection, tumor or trauma. The cerebral vessels appear to have a normal distribution and are free of significant atherosclerosis.

NECK: The tongue is unremarkable. The hyoid bone and laryngeal cartilages are intact. The cervical spine is not fractured.

BODY CAVITIES: The body is opened with the usual Y-shaped incision. The organs occupy their usual positions and relationships, and there are no abnormal fluid accumulations. No rib, spine or pelvic fractures are seen.

CARDIOVASCULAR SYSTEM: The 350 g heart is grossly enlarged with a smooth epicardial surface. Upon sectioning, the coronary vessels demonstrate multifocal areas of narrowing greater than 50% throughout the left anterior descending coronary artery by non-calcific atherosclerotic plaque. The remaining major vessels demonstrate minimal atherosclerotic narrowing. The myocardium is firm and red, without obvious fibrosis. There is moderate dilatation of the left ventricle. The endocardium and cardiac valves are unremarkable.

The aorta is opened and reveals moderate atherosclerotic plaque formation.

RESPIRATORY SYSTEM: The right and left lungs weigh 340 and 400 g, respectively, and have smooth pleural surfaces. The parenchyma is pink-red and atelectatic, with small blebs involving both upper lung lobes. No mass lesions or consolidations are seen. No pulmonary thromboemboli are present.

GASTROINTESTINAL SYSTEM: The esophagus, stomach and small and large intestines are unremarkable. The stomach is empty. The pancreas is unremarkable.

HEPATOBILIARY SYSTEM: The 1,470 g liver has an intact capsule and a tan-brown parenchyma with no mass lesions or fibrosis. The gallbladder is present and contains multiple green calculi, averaging 0.8 cm in diameter, but is otherwise unremarkable.

LYMPHORETICULAR SYSTEM: The 130 g spleen has a blue-gray, intact capsule and an unremarkable parenchyma.



EXHIBIT 13

GENITOURINARY SYSTEM: The right and left kidneys weigh 150 and 400 g, respectively, and have generally smooth cortical surfaces. The parenchyma is red-brown with multiple bilateral simple cysts, measuring up to 8 cm in greatest dimension. The collecting systems are not dilated. The urinary bladder is fully distended with urine and has an unremarkable mucosa.

The uterus is present and non-gravid. Both ovaries are identified and appear unremarkable.

ENDOCRINE SYSTEM: The thyroid and adrenal glands are unremarkable.

**MICROSCOPIC EXAMINATION**

Lungs: Rare aggregates of nests of bland cells with large nuclei and a granular chromatin pattern in a background of otherwise unremarkable lung parenchyma.

Liver: Fatty change affecting approximately 30% of the hepatocytes.

Pancreas: Moderate autolysis.

Kidneys: Unremarkable except for a simple cortical cyst.

No significant histopathologic abnormalities of the adrenal glands, spleen, brain and thyroid.

**ANCILLARY STUDIES**

Full body radiographs are performed prior to autopsy.

Incisions were made along the body surfaces of both wrists and ankle and there is no evidence of hemorrhage or trauma.



**FINDINGS**

I. Atherosclerotic cardiovascular disease
   A. Cardiomegaly, 350 g
   B. Moderate coronary artery and aortic atherosclerosis
   C. Left ventricle dilatation

II. Clinical history of schizoaffective disorder

**CONCLUSION**

It is our opinion that Janice Dotson-Stephens, a 61 year old female, died as the result of atherosclerotic cardiovascular disease (an enlarged heart with narrowing of the vessels). There is no evidence of significant trauma or toxic ingestion that would have caused or contributed to death. Contributing to death is schizoaffective disorder.

**SAMANTHA R. EVANS, MD**
Deputy Medical Examiner - Prosector

**RANDALL E. FROST, MD**
Chief Medical Examiner

**D. KIMBERLEY MOLINA, MD**
Deputy Chief Medical Examiner

SRE:dm

Original: file

**BEXAR COUNTY MEDICAL EXAMINER'S OFFICE**

7337 LOUIS PASTEUR
SAN ANTONIO, TEXAS 78229-4565
(210) 335-4000
FAX (210) 335-4002

*"Accredited by the National Association of Medical Examiners"*

# TOXICOLOGY REPORT

**ME Case #:** 18-02984
**Decedent:** Dotson-Stephens, Janice
**Staff Pathologist:** Samantha R. Evans, M.D.
**Chief Toxicologist:** Veronica Hargrove, Ph.D.

**Age:** 61 Years
**Type:** Autopsy
**Exam Date:** 12/15/2018
**Completed Date:** 1/17/2019

☐ **No toxicology testing requested**

| Assay | Sample | Analyte | Results | Instrument |
|---|---|---|---|---|
| Acid/Neutral | Blood-Thoracic Aorta | Acid/Neutral | None Detected | GC/MSD |
| Alcohols | Blood-Thoracic Aorta | Alcohols | None Detected | HS GC/FID |
| Alcohols | Vitreous | Alcohols | None Detected | HS GC/FID |
| Alkaline | Blood-Thoracic Aorta | Alkaline | None Detected | GC/FID; GC/MSD |
| Drug Screen 1 | Blood-Thoracic Aorta | Drug Screen 1 | None Detected | LC/MS/MS |
| Metabolic Panel | Vitreous | Sodium | 150 mmol/L | Enzymatic |
| Metabolic Panel | Vitreous | Potassium | 9.65 mmol/L | Enzymatic |
| Metabolic Panel | Vitreous | Creatinine | 0.51 mg/dL | Spectrophotometer |
| Metabolic Panel | Vitreous | Glucose | <6 mg/dL | Enzymatic |
| Metabolic Panel | Vitreous | Chloride | 123 mmol/L | Spectrophotometer |
| Metabolic Panel | Vitreous | Urea Nitrogen | 8.0 mg/dL | Enzymatic |

2/7/19



# Another avoidable tragedy in the Bexar County jail

Express-News Editorial Board Published 12:00 am CDT, Saturday, May 4, 2019

Photo: William Luther /San Antonio Express-News

IMAGE 1 OF 3

Members of the Texas Organizing Project hold a press conference March 7 outside the Bexar County courthouse. They are asking Bexar County judges to create a concrete plan to end the practice of cash bail in the
... more

The charge was criminal trespass, but Jack Michael Ule was put in jail because he was homeless and mentally ill. He died there, a tragic example of the criminal justice reform needed but that too many are still trying to stymie.

Ule spent two weeks in the Bexar County Adult Detention Center for a nonviolent misdemeanor simply because he could not afford a nominal bond. He spent two weeks locked up, and he never saw a judge. Tragically, this is all too familiar. The contours of Ule's death on April 18 mirror the December death of Janice Dotson-Stephens, another inmate in the Bexar County Jail. Both had schizophrenia diagnoses. Adults in their 60s, both were charged with criminal trespass and held on low bonds. For Ule, bond was $500. For Dotson-Stephens, it was $300. Neither received representation at their bail hearings, nor appropriate mental health treatment while languishing in jail.

Recommended Video

Their deaths were four months apart, but each is the same damning indictment of a broken system desperately in need of the very reforms Bexar County's judges continue to resist and reject. If Bexar County's judges had embraced bail reform for nonviolent misdemeanors, Ule would never have died in jail. If Bexar County's judges truly embraced public defender representation for all defendants at bail



hearings, Ule's mental health issues may have been flagged, and again, he may never have ended up in jail.

But he did end up in jail. Just like Dotson-Stephens was placed in jail. Just like countless others who are homeless or have mental health issues find their way into jail each day.

Ule was from Ohio. He was a bright student, earning straight As in grade school and high school. He studied agronomy at Ohio State University, his brother Joseph Ule told us. But as an adult, he "was kind of diagnosed with paranoid schizophrenia," Joseph Ule said.

He could be difficult when not on his medication, which was often. But he made his way, working at times as a cook and living with his mother, Sylvia Ule, in Richmond Heights, Ohio, just outside Cleveland.

After his mother died about four years ago, Ule became homeless. Sylvia was behind on her property taxes, and Joseph Ule said the house had to be sold.

"He didn't understand why he had to move out of the house," said Peggy Taksar, Ule's sister. "He kind of just went on his own."

Joseph Ule lives in Kansas City and said he offered his brother a place to stay there, but his brother wasn't interested. Instead, Ule drifted across the Southwest. Phoenix. Albuquerque. Colorado. El Paso. North to Ohio and then south to the sunshine. It was hard to keep tabs. Joseph Ule was battling pancreatic cancer back in Kansas City, and his brother was an adult. Ule might have been schizophrenic, but his siblings couldn't force him into treatment. As long as he wasn't a danger to himself or others, he was free to come and go. Joseph Ule said he had long been dreading the call he received about his brother.

His family didn't know how long Ule was in San Antonio or what brought him here. Joseph Ule thought it was the warm weather. Taksar thought her brother might have been making his way to El Paso.

But we know from a University Health System police report that he received medical assistance in February, and that UHS police had warned him about criminal trespass in March. We also know he listed Haven for Hope, the community's homeless shelter, as his address. On April 4th, UHS police arrested Ule, 63, for criminal trespass at University Hospital in the Medical Center.

It was 12:08 a.m., and he was "watching television in an unoccupied waiting area without an appointment," wrote officer Edwin Bell.

Ule said he had recently been discharged from the hospital "and he wanted to rest and watch television." Bell said he was loitering.

University Hospital is the immediate alternative to jail for people in mental health crises, but in this case the system worked in reverse. The hospital sent a person with mental illness to jail. Why?

"In a situation where we have a disturbance at the hospital or another University Health System facility, officers are faced with three options: asking the person to leave, making an arrest, or putting the person in emergency detention," wrote Elizabeth Allen, a public relations manager for UHS. "The officer, like the majority of our officers, has had crisis intervention training to accurately assess these things, and this person did not qualify for emergency detention."



But that doesn't mean he should have qualified for jail.

In jail, his case was fast-tracked. It moved so fast the public defender never had the chance to meet with Ule and represent him at his bail hearing. It moved so fast no one took into account his previous mental health history.

Consider this timeline: 2:30 a.m. Ule entered the county's Justice Intake and Assessment Center.

2:42 a.m. The public defender's office received his booking slip.

3:30 a.m. Judge Celeste Ramirez set his $500 bond.

There are two problems here. The first is that even though the public defender's office is supposed to represent defendants at bail hearings, that representation comes with caveats. Per a district judge order, the public defender can't represent defendants with existing representation or another bond.

In real terms, that has meant public defenders have to jump through many hoops to determine if someone is eligible for representation. In our view, this obstacle reflects the district judges' resistance to expanding the public defender's office and providing representation at bail hearings.

The second problem is that beyond bail hearings, the public defender's office primarily represents mentally ill defendants accused of low-level offenses. People just like Ule. But in this case, Ule was assigned a private court-appointed attorney.

"He would have been the perfect candidate for our program," said Bexar County Chief Public Defender Michael Young. "He had indicated some mental illness. He was charged with a low-level offense."

But the public defender never even had the chance to speak with Ule.

Instead, he spent the next two weeks in jail, a homeless man from Ohio with a $500 bond. It might as well have been $5 million. His family would have paid the bond in a heartbeat, but they had no idea where he was.

"People being thrown in jail because they are homeless," said a disgusted Bexar County Judge Nelson Wolff, who oversees Commissioners Court. "Because they got a mental problem. Because they can't afford to pay a bond. That's what the justice system is? No, it's not."

In jail, Ule joined a cadre of people charged with criminal trespass who couldn't make nominal bonds. According to data from the Bexar County Sheriff's Office, the week Ule died, 54 people were in jail for criminal trespass. Their bonds ranged from $100 to $2,000.

Ule died April 18, and the cause of his death remains unknown. A press release from the sheriff's office cites "ongoing health issues" as a a possible factor. In the aftermath of this tragedy, Bexar County District Attorney Joe Gonzales said he will no longer prosecute people charged with criminal trespass.

"There are exceptions to every rule, but as a general matter, I don't think we need to have the homeless population in the Bexar County Jail because they are homeless," he said.



EXHIBIT 14

And Ule's death was one of the reasons Bexar County Commissioners decided to have city of San Antonio judges oversee bail hearings. Municipal Court Presiding Judge John Bull has welcomed the public defender and said the defense and prosecution will be present at all bail hearings.

As welcome as these changes are, they are not enough. Meaningful criminal justice reform must be embraced by Bexar County's felony and misdemeanor court judges, and this includes a better job identifying mental health issues to keep people out of jail.

There will be one more journey for Jack Ule. His ashes will be sent to Kansas City where there will be a service at a Slovenian church to honor his heritage, Joseph Ule said. His remains will then be buried in Ohio, beside his mother.

© 2019 Hearst Communications, Inc.

4

https://www.mysanantonio.com/opinion/editorials/article/Another-avoidable-tragedy-in-the-Bexar-County-jail-13818158.php