```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
 2                   SAN ANTONIO DIVISION

 3

    MICHELLE DOTSON, ET AL,          .
 4                                   .
                   PLAINTIFFS,       .
 5         vs.                       . DOCKET NO. SA:19-CV-83-XR
                                     .
 6  BEXAR COUNTY, ET AL,             .
                                     .
 7                 DEFENDANTS.       .

 8

 9

10         TRANSCRIPT OF MOTION TO DISMISS PROCEEDINGS
            BEFORE THE HONORABLE XAVIER RODRIGUEZ
11              UNITED STATES DISTRICT JUDGE
                       MAY 9, 2019

12

13  APPEARANCES:
    FOR THE PLAINTIFFS:      LESLIE J.A. SACHANOWICZ, ESQUIRE
14                           CALFAS LAW GROUP
                             310 S. ST. MARY'S STREET
15                           24TH FLOOR
                             SAN ANTONIO TX 78205
16
    FOR THE DEFENDANT:
17  BEXAR COUNTY HOSPITAL    LAURA ANNE CAVARETTA, ESQUIRE
                             CAVARETTA KATONA & FRANCIS, LLC
18                           ONE RIVERWALK PLACE
                             700 NORTH ST. MARY'S STREET
19                           SUITE 1500
                             SAN ANTONIO TX 78205
20

21  FOR THE DEFENDANTS:
    BEXAR COUNTY             ROBERT WILLIAM PIATT, III, ESQUIRE
22  JAVIER SALAZAR          BEXAR COUNTY CRIMINAL DISTRICT ATTY.
    MIKE LOZITO              101 W. NUEVA
23                           7TH FLOOR PAUL ELIZAONDO TOWER
                             SAN ANTONIO TX 78205
24

25
```

```
 1 | FOR THE DEFENDANTS:
   | MICHAEL KOHLLEPPEL
 2 | CITY OF SAN ANTONIO      MARK KOSANOVICH, ESQUIRE
   |                          FITZPATRICK & KOSANOVICH, PC
 3 |                          P.O. BOX 831121
   |                          SAN ANTONIO TX 78283
 4 |
   |
 5 |
   |
 6 | REPORTED BY:             GIGI SIMCOX, RMR, CRR
   |                          OFFICIAL COURT REPORTER
 7 |                          UNITED STATES DISTRICT COURT
   |                          SAN ANTONIO, TEXAS
 8 |
 9 |
10 |
11 |
12 |
13 |
14 |
15 |
16 |
17 |
18 |
19 |
20 |
21 |
22 |
23 |
24 |
25 |
```

1      *(San Antonio, Texas; May 9, 2019, at 10:30 a.m., in open*
2   *court.)*
3           THE COURT:  19 civil 383, Michelle Dotson and others
4   versus Bexar County.
5           MR. SACHANOWICZ:  Good morning, Judge.  Leslie
6   Sachanowicz here for the Dotson family, and Valerie Hedlund.
7           THE COURT:  Thank you.
8           MS. CAVARETTA:  Your Honor, it's Laura Cavaretta on
9   behalf of the Bexar County Hospital District doing business as
10  University Health System.
11          MR. PIATT:  Your Honor, Robert Piatt on behalf of
12  Bexar County, Mike Lozito, and Sheriff Javier Salazar.
13          MR. KOSANOVICH:  Mark Kosanovich on behalf of the
14  City of San Antonio and Officer Kohlleppel.
15          THE COURT:  Thank you.
16          MR. KOSANOVICH:  Kohlleppel, your Honor.  I
17  apologize.
18          THE COURT:  Is that how you say it, Kohl --
19          MR. KOSANOVICH:  Kohlleppel.
20          THE COURT:  Kohlleppel.  Okay.  It's not Kohl-lapel,
21  it's apple?
22          MR. KOSANOVICH:  Apple.
23          THE COURT:  Okay.  Thank you.
24          Tragic case here.  So Miss Dotson was a pretrial
25  detainee in the jail.  She was picked up for criminal trespass

1  on July 17, 2018.  She spends 151 days in jail.  I mean — is

2  this true? —  without appearing before a judge for a Class B

3  misdemeanor?  And then she dies in custody.  What happened?

4         MS. CAVARETTA:  Your Honor, Miss Dotson was placed in

5  the infirmary because she identified or was known to have a

6  psychiatric disorder.  She was kept in the infirmary where she

7  was monitored.

8         She refused to have her blood pressure taken.  She

9  refused any interventions, and she refused to go to court.

10  She refused meeting with her attorneys.  The psychiatrist sent

11  a letter to the court and said, we need to get an order for

12  her to be evaluated because she's not mentally competent.

13  Then an evaluation was done.

14         And I don't believe her attorney ever met with her or

15  followed up on the evaluation and she unfortunately died in

16  the jail of a heart attack.  She had a history of heart

17  disease in her family and she was found nonresponsive in the

18  medical unit when they went to check on her.  She had died

19  from a heart attack, not anything related to the process.

20         THE COURT:  So I thought the court-ordered competency

21  evaluation was not in the file, so how do you know one was

22  actually done?

23         MS. CAVARETTA:  My understanding is that one was done

24  and that — and this I'm taking from the county's attorney,

25  which maybe I should let him answer that question since it's

1  not my information.  Is that okay?

2          THE COURT:  Sure.

3          MR. PIATT:  Yes, your Honor.

4          In this case, the magistrate did hear the issue of

5  her competency, ordered a competency evaluation to be

6  completed.  One of the exhibits to the latest amended

7  complaint is that order where the magistrate judge set a time

8  line for the evaluation to take place and then get returned to

9  the court, not to the magistrate, but to County Court 4 where

10 this matter was pending.  The evaluation took place I believe

11 in September, September 12th, and the report made it back to

12 the court by October 4th or 5th.

13         My understanding, based on the information so far, is

14 that it was received by County Court 4, that a clerk

15 considered it to be HIPAA protected information, sealed it,

16 and put it in the file.  This, combined with what appears to

17 be inactivity by the court-appointed counsel meant that this

18 evaluation was done but was never acted upon and the

19 magistrate judge never came back for the second part to

20 declare her incompetent.

21         By the way, your Honor, I still cannot access what is

22 actually in that HIPAA file in County Court 4 because they

23 said that it's HIPAA protected information.  I'll need an

24 order to see it.  But I believe that it will say that the

25 evaluator determined her to be incompetent and it was never

1  acted upon.

2       THE COURT:  Wow.  So a series of mistakes, but how

3  does this get us to all the constitutional and statutory

4  violations you-all are alleging?

5       MR. SACHANOWICZ:  Well, your Honor, just one other

6  caveat is, the last entry in her medical records on December

7  14th, the morning that she died, there was an entry saying

8  that she's awaiting competency hearing.  When we got the

9  medical records, there was no evaluation in the medical

10  records.  So that's just –– and also, when I looked in the

11  actual case jacket, there was no evaluation there.

12       And I think this is really what's important, Judge.

13  What the medical records really do is reveal that Miss Dotson

14  was there for 151 days, she lost 146 pounds.  That's the size

15  of a human being.  Quite frankly, she was quite ill.

16       To answer your question, how is this a constitutional

17  violation, we are alleging the violation of the Equal

18  Protection Clause, just like in *Odonnell* and *Graham*, in terms

19  of the deprivation of her liberty because she could not afford

20  to pay the $300 in bail ––

21       THE COURT:  So let me break this apart, though.  So

22  as to the hospital, though, so the hospital has filed a motion

23  to dismiss and a 12(c) motion.  I mean, how do any of your

24  claims survive against the hospital?

25       MR. SACHANOWICZ:  If you look, we also filed a motion

1  for a third amended complaint because we didn't have the

2  medical records when we filed a second amended complaint.  So

3  how it survives for the hospital, Judge, is that in a third

4  amended complaint we specifically name Dr. Yao, Jessica Yao,

5  which in the records she appears to be the director of the UHS

6  Correctional Services.

7           And those records, those records reveal a pattern of

8  practice of deliberate indifference.  I'm talking about the

9  hospital district.  She was seen and refused her meals 110

10 times.  Nobody —— other than making notations that she refused

11 the meals, there was nothing else that was done.

12          There was a lot of, I would say, proposals for plans

13 in the medical records, but also there is no entries or

14 narratives for any treatment.  Also, the medications page is

15 totally blank in the medical records.  And so ——

16          THE COURT:  Don't we already know that through the

17 absence of any kind of medications in her bloodstream that

18 none were given?

19          MR. SACHANOWICZ:  Until discovery is completed, I

20 won't know that.  And usually the medications dispense page

21 will be totally blank.

22          So what you can see is, specifically on page 15 —— I

23 have an actual copy of my third amended complaint I'll be

24 happy to share with the court —— on page 15 and 16 you can see

25 the number of times Miss Dotson was seen.  And the fact is, is

1  all the entries indicate just sort of what I would call a
2  cutting and pasting saying this person is waiting for a
3  competency evaluation, you know.  So there is a lot of markers
4  along the way.  There is a pattern, seems to be, of not
5  addressing the issue.
6          And, in fact, Mr. Ule, who died in April 14th in the
7  same area, he was a similar type person, similar background.
8          And it's true that the autopsy report says there is
9  two contributing factors, one is she had an enlarged heart or
10 a heart attack; and then psycho — I can't pronounce it,
11 but — schizoaffective disorder.
12         And, to think, if someone who has schizoaffective
13 disorder, the stress it would put on that person, if they are
14 not medicated, if they are not treated.  And I've talked to
15 the family, and without medication and treatment, she would
16 refuse to eat, so she basically died in psychological or
17 physical isolation because of the hospital district not taking
18 care of her.  There is a pattern here.
19         I mean, when I read that she had lost 146 pounds,
20 Judge, I mean, to me, it's just horrific.  This smacks of a
21 Third World country, that somebody should lie there and some
22 nurse telling the person saying, you know what? — you want
23 some water, there is some water in your tap.  That's just an
24 example.  But the thing is, it's sad for that person.  And
25 it's clear that it's cruel and unusual punishment.

1       THE COURT:  So someone from UHS want to address this?

2       MS. CAVARETTA:  Absolutely, your Honor.

3       THE COURT:  Why shouldn't I just grant the amended

4   complaint, grant Docket 47, moot 38, which was an earlier

5   version of a motion to amend complaint and dismiss without

6   prejudice 37, which is your motion?

7       MS. CAVARETTA:  First of all, when this lawsuit was

8   filed, or before this lawsuit was filed, plaintiffs' counsel

9   never requested medical records.  You don't have to file a

10  lawsuit to get medical records.  You show up to the health

11  system with an authorization and you get the medical records.

12  No authorization was ever presented until after our pretrial

13  conference, or our —

14      THE COURT:  26(f)?

15      MS. CAVARETTA:  Right.

16      And so this lawsuit was filed without ever looking at

17  the medical records, which I think is lack of diligence on the

18  plaintiffs' part.  And when the lawsuit was filed in state

19  district court it contained no allegations against UHS.  It

20  just said defendants were negligent and it had like some

21  captions that said, Wrongful Death UHS, Civil Rights UHS, but

22  no facts.

23      THE COURT:  He was trying to avoid the Temple of

24  Doom, being federal court.

25      MS. CAVARETTA:  Correct.

1          THE COURT:  Right.

2          MS. CAVARETTA:  And so then we entered the Temple of

3  Doom and I filed a motion to dismiss.  And in response to that

4  they sought leave — actually they didn't seek leave, they

5  just filed an amended complaint.  I pointed out that you need

6  to seek leave.  They finally did that.  The court granted

7  leave.  And in your order granting them leave you mention that

8  obviously you have discretion, and one of the — some of the

9  factors to consider are undue delay, dilatory motive, repeated

10  failure to cure deficiencies.

11          And in this particular case the court, in its

12  infinite wisdom decided, we'll let him file an amended

13  complaint.  They did.  And they did that in the face of my

14  motion to dismiss, which specifically set out all of the

15  things that they did not plead as to UHS.  They filed a second

16  amended complaint and they didn't cure anything.

17          THE COURT:  So let's talk about their attempted third

18  try.

19          MS. CAVARETTA:  So their attempted third try —

20          THE COURT:  Well, from your reading of it, does it

21  cure your allegations or your issues, or not?

22          MS. CAVARETTA:  I don't believe it does.

23          THE COURT:  And why?

24          MS. CAVARETTA:  Because they do not explain how UHS's

25  failure caused Mrs. Dotson's death.  So, okay, yes, she lost

1    150 pounds.

2            THE COURT:  But can't we attribute to the fact that,

3    you know, she was — because of the lack of medications and

4    the lack of food, frankly, why couldn't those two issues,

5    again this is a plausibility standard, why couldn't the

6    combination of those two issues have also contributed to the

7    heart failure?

8            MS. CAVARETTA:  I think they would need to plead

9    that.  And they haven't.  They've just said, she was seen this

10   many times, she lost weight, she died.  And she should have

11   been — and, yes, the record does say she was awaiting the

12   competency hearing, because she was.

13           Because, as Mr. Piatt explained, the evaluation was

14   done and sent to the court and the court didn't have a

15   hearing.  The medical records also contained many entries by

16   UHS employees contacting the court and contacting pretrial

17   services, saying, hey, are you going to do anything about this

18   lady?  And so what we have is a situation where — and the

19   other thing is —

20           THE COURT:  So wait a minute.  Hold on.  UHS, are you

21   a county jural entity, or what are you-all?

22           MS. CAVARETTA:  So we are a political subdivision of

23   the State of Texas, a separate legal entity from —

24           THE COURT:  I'm trying to figure out if one element

25   of the county was throwing the other element of the county

1  under the bus.

2         MS. CAVARETTA:  No.

3         THE COURT:  But you are a separate jural entity,

4  okay.

5         MS. CAVARETTA:  Separate legal entity, and we are in

6  the facility at the pleasure of the sheriff's department.

7  They control and the police department controls who comes

8  there, and when they can leave, and when they can't leave, and

9  where they get assigned; except that we recommend.  And in

10 this case they said yes, she needs to be in the infirmary,

11 which is where somebody gets seen.  And she was seen three to

12 four times a day.

13        In your last order when you said, well, I'll go ahead

14 and let them amend, one of the other factors you considered is

15 they weren't trying to name new parties.  In their motion for

16 leave they don't advise the court of this but they are trying

17 to add Dr. Yao as an independent.

18        THE COURT:  And so how is UHS prejudiced, I mean, if

19 that's the other factor?  I mean, we've just started this

20 litigation.  I mean, this is an awful case.  Somebody made a

21 mistake.  Now, whether we're going to get to the issue, I

22 mean, frankly, what makes these cases so difficult is, you

23 know, between all the immunities that may or may not be

24 applicable here, this may not all — this may come to not.

25 But, I mean, at this point, this is a plausibility 12(b)(6)

1  standard, and so how are you prejudiced?

2        MS. CAVARETTA:  And I guess it comes down to I filed

3  my first motion to dismiss.  Then they filed an amendment,

4  which didn't comply or do what it needed to do.  So then my

5  client incurred fees for me to file the second motion to

6  dismiss.  Then they seek leave of court to file the third

7  amended complaint.

8        And it just boils down to how many chances does

9  somebody get, when they did not do their own due diligence and

10  even obtain the records, which they should have had before

11  they even filed suit, in my opinion.  And if the court is

12  inclined to grant them leave, then, again, I'm assuming that

13  my motion to dismiss would be denied as moot, as you did the

14  last time, and so then I would file yet another motion to

15  dismiss based on the new pleadings and address the issue yet

16  again.  And so the prejudice really is delay and attorneys

17  fees that my client is incurring for me to — they keep moving

18  the ball and I keep having to go chase it down.

19        THE COURT:  Do you want to respond?

20        MR. SACHANOWICZ:  Yes, your Honor.

21        In this last pleading we've been very mindful of the

22  parties, and, in fact, what we did is we took all the parties

23  out individually, realizing that, really, if there was any

24  action against them, it would be in their official capacity,

25  to try to clean up the pleadings, because I've worked those

1    cases before and this becomes an issue in terms of the case.

2         So we have exercised good faith, Judge.  And I

3    apologize to the court.  The month of March was kind of hectic

4    for me.  I had three jury trials.  So it's on me.  I

5    understand that.  But this doesn't deserve — the fact is that

6    there is a colorable claim in here against UHS Correctional

7    Services.  And I understand how they work.  They are a

8    separate legal entity, separate from the county.

9         So there's two issues here.  Was Bexar County cruel

10   and unusual to Miss Dotson?  We don't know.  I think they

11   plausibly have, based on the — just on the medical records

12   that we found, has UHS Medical — Correctional Services been

13   cruel and unusual punishment for Miss Dotson?  I think the

14   answer is plausible, yes, because just in the medical records

15   she was seen three times a day.

16        Well, that's an admission saying, yeah, I looked at

17   you three times a day but I didn't do anything to you for your

18   treatment three times a day for 150 days.

19        THE COURT:  So I'm going to yet again grant you leave

20   to amend.  I mean, this is just a case that — I mean, I think

21   everybody deserves to know what happened so it doesn't happen

22   again.  And ultimately this may just come down to County Court

23   of Law #4 messed up, and its employees messed up, and

24   unfortunately, even if that's the case, it may be that all of

25   this is going to be barred by immunity, but the public and the

1  family of Miss Dotson at least deserves to know what happened.

2       But, Mr. Sachanowicz, you have to — this next time

3  around, let's not file what you propose.  Let's do another

4  look at it closely, because I'm looking at that amended

5  complaint coming in and some of your allegations.  I don't

6  know if you are saying, was this an intentional act?  Or was

7  this a negligent act?  And so then I'm left wondering, okay,

8  is the Tort Claims Act going to apply here?  Or is the tort

9  claims immunity going to apply here?

10      MR. SACHANOWICZ:  We actually took out all the

11  wrongful death claims in this pleading also, so we are going

12  strictly on the 1983 action.

13      THE COURT:  So, again, you know, I'm going to give

14  you your one last, best shot at filing a complaint.

15      MR. SACHANOWICZ:  Okay.

16      THE COURT:  I'm going to give you leave to file a new

17  complaint.  If you think you are going to stand by what I just

18  read, giving you my little hints about what I'm concerned

19  about, you want to stand by that, then you are welcome to

20  stand by that, but if you want to file something else that

21  cleans it up further, you are welcome to do that as well.

22  But, I mean, at some point I do need to close the pleadings at

23  some point.

24      MR. SACHANOWICZ:  Okay.  We will do that, Judge.

25      THE COURT:  So UHS — well, here's the ruling then.

1   47 is granted.  You have leave to file a new complaint within

2   14 days.

3           38 is dismissed as moot.

4           37 is denied without prejudice to leave to file a new

5   motion to dismiss.

6           With that said, where are we at on discovery?  Are we

7   going to just wait for another round of pleading fights, or

8   are we going to move forward, or what are we going to do?

9           MR. SACHANOWICZ:  Judge, we are drafting discovery

10  right now and trying to be very succinct about it.  We talked,

11  we conferred in a pretrial conference, and my intention is not

12  to do the broad brushstroke, and sort of ask specific

13  questions as to the policies within the UHS Correctional

14  Services, which is separate from Bexar County, and so in terms

15  of what happens in the bail process and the personal bond

16  process.

17          So we're in the process of drafting those and my hope

18  is to get those to the defendants within the next 30 days.

19  And I don't foresee taking a lot of depositions.  I mean, at

20  this time I don't think Sheriff Salazar is going to have

21  personal knowledge of this.  It's going to be based on what

22  his support staff did.  So it's going to be very tailored.

23  It's not kind of, like I said, a broad brush approach.

24          MS. CAVARETTA:  And, your Honor --

25          THE COURT:  Yes.

1          MS. CAVARETTA:  In terms of discovery as to UHS, I do
2    believe that we need to get the pleadings cleaned up and let
3    me address whether or not they have a claim against UHS before
4    my client is put to the expense of producing documents and
5    providing information, because at this point in time they
6    finally got the medical records.
7          They have what they need to be able to either assert
8    a claim against us or not.  And if in 14 days they file a
9    petition or a complaint that I don't need to file a motion to
10   dismiss, then we can move on from there, but I anticipate that
11   I'm going to be filing another motion to dismiss.
12         THE COURT:  Yeah.  I'm sure we are going to hear
13   other motions to dismiss by some of the other employees.  So I
14   have been putting the hospital district to some extra expense,
15   so I'll give you that.
16         You look at the medical records first and if you want
17   any more depositions past that, speak to Miss Cavaretta, and
18   if you can reach an agreement, fine, but if there is a dispute
19   then I'll figure out what additional discovery you are
20   entitled to.
21         MR. SACHANOWICZ:  Okay.
22         THE COURT:  Last thing before I forget, so I can't
23   remember what you did in this last proposal, but Bexar County
24   Pretrial Services.
25         MR. SACHANOWICZ:  We have nonsuited them also.

 1          THE COURT:  Okay.  Because they are the same as Bexar
 2    County.
 3          MR. SACHANOWICZ:  What we did is we tried to clean up
 4    the pleadings because they are a nonentity, and then took out
 5    the people individually, and then we dropped the wrongful
 6    death claims, and just — we weren't sure whether Dr. Yao was
 7    the director or not, or the acting director, so we're not
 8    going to have service on her until we file the next amended
 9    complaint.
10          THE COURT:  Where does the City of San Antonio fall
11    into this?
12          MR. KOSANOVICH:  If I may, your Honor.
13          I'm following along with what Mr. Sachanowicz said a
14    moment ago.  I currently have on file an answer for the City
15    of San Antonio and Officer Kohlleppel.  In his third amended
16    petition they have dismissed him in his individual capacity.
17          And if that's the route that we are going to take,
18    then I would ask that the court enter an order dismissing him
19    in his individual capacity because he's no longer going to be
20    a defendant before the court, because I went back and I double
21    checked the pleading and they initially had him in his
22    individual capacity.
23          Officer Kohlleppel is the individual who arrested
24    Miss Dotson.  I'm going to throw out the date here, your
25    Honor, six, seven months before her death, and it was for the

1  criminal trespass at an apartment complex.

2       THE COURT:  It was July.  August, September, October,

3  November, December.  Five months.

4       MR. KOSANOVICH:  Somewhere in there.

5       THE COURT:  Yeah.

6       MR. KOSANOVICH:  So he booked her.  She refused to

7  leave the property and then she was telling him that she

8  wanted to go to jail.  And the owner of the property, or the

9  apartment complex manager, I believe Miss Dotson's husband

10 actually lived there at some point, or lived there, but the

11 manager had asked that she be removed, in other words, the

12 criminal trespass.  Your Honor, I'll cut to the point.  It's

13 all on body camera.

14      THE COURT:  So you can get discovery from what

15 happened, but, I mean, how is that relevant to 151 days she

16 spent in there, the denial of food, and all of that, that

17 caused this, maybe this death?  I mean, just what do you have

18 against the officer and the City?

19      MR. SACHANOWICZ:  I refer the court to, I think it's

20 paragraph 111, is what happened is with regards to the

21 officer, Miss Dotson had been previously arrested or detained.

22 And in those previous, three previous occasions, we were able

23 to discover from the SAPD reports is they were classified as

24 mental health disturbances.  The arresting officer has

25 discretion under their policy manual as to whether to do like

1  a civil commitment or a criminal commitment.

2          And, in fact, we're alleging that they were imparted

3  with the knowledge, because it was from their computer system,

4  so when you put her name in the system, he would see that this

5  person, Dotson-Stephens, previously had this -- had this, you

6  know, and so --

7          THE COURT:  But isn't all of that going to be barred

8  by qualified immunity?  How do you get around that?

9          MR. SACHANOWICZ:  They won't, Judge, because there's

10  a policy and practice.  They are not following the policy or

11  practice and --

12          THE COURT:  But you just told me the practice -- the

13  policy is that the officer has discretion; right?

14          MR. SACHANOWICZ:  Right.  But the practice is, and

15  this is why the DA Joe Gonzalez instituted this policy

16  probably about two or three weeks ago, that any criminal

17  trespass case or criminal mischief case, if it involves a

18  homeless person, then his office will not prosecute.

19          Because what's happening is, and this happened with

20  Mr. Ule from two or three weeks ago, the officer again had

21  discretion, but what they are doing, the fact of doing, is

22  they are not actually following their own procedures and they

23  are taking everybody to the jail because it's easier, just

24  take them to jail.

25          Because this other policy, it's called the crisis

1  team, they have to do like an evaluation, you know.  And so

2  what's happening is SAPD has gotten into -- I think discovery

3  will show if I just ask him, give me all the criminal

4  mischief, criminal trespass cases that you have, say, for

5  2018, and how are they dealt with involving a person with some

6  sort of mental incapacity, were they taken to the jail or did

7  you call the crisis team?  And I think what's happening is

8  that SAPD, they have had this policy, but there are not

9  practicing their own policy.

10           MR. KOSANOVICH:  If I may respond, your Honor.

11           THE COURT:  Yeah.

12           MR. KOSANOVICH:  Let me try to break this down,

13  because I think what Mr. Sachanowicz is trying to tell the

14  court is that we automatically take everybody to the jail for

15  whatever violation it may be.

16           Our policy has, if I remember correctly, and it's

17  been a while since I've read it when this case first came up,

18  there's kind of a fork in the road, and I'm giving this in

19  general terms, about where the officer can take an individual

20  depending on their assessment of the situation.

21           But, for Mr. Sachanowicz to stand here and say that

22  everybody that has a criminal mischief charge is being taken

23  to the jail, is then you are assuming that all of those people

24  would have to have some type of a mental incapacity and

25  therefore they should be taken for mental services, as opposed

1 to the other location.

2         But I guess the whole fallacy, where this whole thing

3 starts to line up is once they get to the jail they actually

4 have access to the services that Mr. Sachanowicz is now

5 complaining about, because once they get to the jail facility

6 they would actually have access to a doctor, a medical screen,

7 a medical evaluation or whatever service they provide.

8         So I guess what I'm not understanding is:  What's

9 wrong with our policy?  And so he's going to go off on to

10 discovery and try to have the City produce which would

11 potentially be thousands upon thousands of records, which I

12 would assume because of the number of people that would

13 potentially be arrested.

14         THE COURT:  So let me ask you this while I've got you

15 up here.  So I didn't understand him making the argument that

16 broad.  I thought he was making the argument that if you were

17 homeless and previously known to be mentally incompetent, then

18 you were being sent to the jail rather than being routed to

19 some other service provider.  That's what I thought I heard.

20         And so my question to you-all, though, is:  Do

21 you-all keep records that, you know, when someone is called to

22 a scene you are able to identify who is previously known to

23 have suffered from some mental disorders?  Or are you going to

24 have to produce -- can you even produce records that say, hey,

25 we encountered this guy, who is homeless?

1          MR. KOSANOVICH:  Well, thank you, your Honor, because
2    I think we're kind of going down the same path here.
3          I don't know if when an officer goes to a scene,
4    let's say like with Miss Dotson, that he would — perhaps he
5    would have access to go through and look at her prior arrest
6    history, but whether an officer would have actually done that
7    on any certain day to look at John Q. Citizen, that he's just
8    got this criminal trespass issue with, or criminal mischief,
9    because those are two different things, then to go through and
10   look to see whether or not that officer actually went and did
11   research and then made a conclusion as to where he was going
12   to take him or her, it's not that precise, your Honor.  I
13   don't think there is any requirement that any officer would
14   ever have to do that.
15         Basically what I'm understanding is they are going to
16   say that officers would then have to go back and do an
17   analysis of whether or not, well this guy is homeless, whether
18   he's not homeless, I don't even think we keep track of whether
19   or not they are homeless.  Maybe it's written in a police
20   report because the individual might have told an officer that
21   he or she was homeless, but the analysis that he's talking
22   about, and even trying to capture discovery at that level is
23   — I don't even know if it's workable, your Honor.
24         MR. SACHANOWICZ:  Your Honor, my response is that
25   there are ten policies that were ignored that are required by

1  the Sandra Bland Act by the City of San Antonio and by the

2  officer.  And also my response is that I do both criminal and

3  civil law.  I'm familiar with the back of the house on the

4  criminal side.  I made open records requests.  I was able to

5  get these records regarding Miss Dotson, which shows emergency

6  detention on — this was on 9/19/2014.

7          And then he brings up a real interesting point.  So

8  he says this is the attitude of the City of San Antonio, we'll

9  just take them to the jail.  They will be examined there.

10  They will be treated there.  All of that.  Well, the jail has

11  failed, the jail standards, Texas jail standards.

12          In fact, we have attached that too where they have

13  civilians doing the medical in-taking of inmates, you know.

14  And so it's like everybody is passing the buck down sort of

15  forward, you know.  And the fact is, the bottom line is, this

16  was an episodic event.

17          And in terms of deliberate indifference, he has

18  subjective knowledge of a risk of serious harm to Miss Dotson

19  because he chose not to follow the department policies.  And I

20  don't need to do a lot of discovery, Judge.  I just need to

21  understand how their system is.  So if he's working with a

22  Dodge cam in the car and he plugs her name in, I'm sure it

23  pops up just like anything else.  If you pop up somebody's

24  name in there and you have previous criminal history, it's

25  going to pop up.

1           THE COURT:  The question is whether it will pop up
2     previous mental disorder.
3           MR. SACHANOWICZ:  Well, I understand that, but what's
4     going to happen is her name will pop up.  If I was able to get
5     this from SAPD, and I'm sure it's on their system, and so it
6     says here emergency detention.  So I'm not going to ask for a
7     lot of discovery.  I just want to understand first the
8     process.  First, for me to understand the process, then we can
9     stop there.
10          THE COURT:  Okay.  So my understanding, though, is
11    you, in this next amended complaint you are filing, you are
12    not including the officer in his individual capacity; correct?
13          MR. SACHANOWICZ:  Correct.
14          THE COURT:  So that's the only written motion I have
15    before me, so that's granted.  And I'll just take up all the
16    other, I'm sure, motions to dismiss that will be filed in this
17    case.
18          MR. SACHANOWICZ:  Right.
19          THE COURT:  Okay.  Good luck.
20          MR. SACHANOWICZ:  Thank you for your time, Judge.
21       (Concludes proceedings.)
22
23
24
25

```
 1                          o0o

 2                       CERTIFICATE

 3   I, Gigi Simcox, RMR, CRR, Official Court Reporter for the

 4   United States District Court, Western District of Texas, do

 5   hereby certify that the foregoing is a true and correct

 6   transcript, to the best of my ability and understanding, from

 7   the record of the proceedings in the above-entitled and

 8   numbered matter.

 9

10

11                       s/Gigi Simcox, RMR, CRR
                         Gigi Simcox, RMR, CRR
12                       Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25
```